The State v. Perigo.

## THE STATE v. PERIGO.

1. **Murder:** EVIDENCE. On a trial for murder, it appeared that defendant killed deceased in a quarrel about the ownership of a dog, which the defendant claimed he bought of W. It appeared from defendant's evidence that at one time when the dog was in deceased's possession he allowed the wife of W. to take it away, from which it was inferred that deceased did not own the dog.

80    37
80    613
80    37
86    750

80    37
100   238
100   505

80    37
109   117

80    37
113   697

80    37
j 117 248

80    37
119   81
119   690

*Held* that, for the purpose of rebutting this inference, it was com-petent for the state to show that the deceased at the time had said that the reason he allowed Mrs. W. to take the dog was because she was not in a condition to quarrel.

2. ———— : ———— : DYING DECLARATIONS. Dying declarations, to be admissible, must be restricted to the act of killing, and to the cir-cumstances immediately attending it, and forming a part of the *res gestæ,* and must relate to facts, and not to mere matters of opinion. Accordingly, the statement made by deceased to the wit-ness, "It is pretty hard to go through the whole war and come home, and be murdered on my own farm," and declarations made by him at the same time in regard to threats uttered against him by defendant a year or so before, were improperly admitted.

3. ———— : REASONABLE DOUBT : INSTRUCTION. An instruction which directs the jury that, if a fair examination of all the evidence raises a reasonable doubt of defendant's guilt, they should acquit, is correct, as against defendant's claim that he should be acquitted if a fair examination of the evidence fails to remove reasonable doubts of his guilt from their minds.

4. ———— : INSTRUCTIONS AS TO LESSER OFFENSES. Where it was shown that defendant killed decedent, and he was put on trial for murder in the second degree, and there was no evidence whatever on which to base a verdict of guilty of any offense lower than manslaughter, *held* that the court rightly limited the inquiries of the jury to murder in the second degree and manslaughter. (See opinion for citations.)

5. ———— : INSTRUCTION AS TO MANSLAUGHTER. In such case, where it was possible for the jury, after considering all the testimony, to have a reasonable doubt as to defendant's guilt of murder in the second degree, the court properly instructed as to the lesser crime of manslaughter.

6. ———— : DEFINITION OF MANSLAUGHTER. On a trial for murder, where an instruction as to manslaughter was proper, it was not error to give a full definition of that term, including involuntary manslaughter, though there was no pretense or evidence that the killing in question was of that character ; for the instruction could not have been misunderstood to defendant's prejudice.

*Appeal from Union District Court.*—HON. R. C. HENRY, Judge.

FILED, MAY 12, 1890.

THE defendant was accused of the crime of murder, committed, as was charged, in the killing of one John Hidinger. He was convicted of murder of the second

degree, and sentenced to a term of imprisonment, from which judgment he appealed to this court. The judgment was reversed and the case remanded ; and on a retrial the defendant was convicted of manslaughter, and sentenced to imprisonment in the penitentiary for a period of five years, from which judgment he appeals to this court. On the trial the defendant excepted to certain rulings of the court in admitting testimony, in giving and refusing certain instructions, and in refusing a new trial. It is conceded that the summary of the testimony as given in the opinion on the former appeal (70 Iowa, 658) contains the substance of the testimony as given on the second trial. The following is a sufficient statement for a full and correct understanding of the questions presented on this appeal : It is not questioned but that on the seventh day of May, 1883, the defendant shot John Hidinger, thereby inflicting upon him a mortal wound, of which he soon thereafter died ; but it is contended that it was done in self-defense. These parties had lived upon adjoining farms for a number of years, and on terms of friendship until about a year prior to May, 1883, when a dispute and angry quarrel occurred on account of a line fence and trespassing cattle, at which time, it is claimed, the defendant made threats of violence against the deceased. The parties occasionally met thereafter, without dispute or quarrel, until the day Hidinger was killed. Each party claimed a certain dog ; the defendant claiming to have bought it of one Wremwick, and the deceased that he got it of one Anderson. On several occasions the dog left defendant's place and went to that of the deceased. On one occasion, Mrs. Wremwick claimed and was permitted to take the dog from Hidinger's, and on several occasions the defendant's boys took it away. On the evening of May 6, 1883, defendant's son went to Hidinger's after the dog. He testified that Hidinger told him he could not have the dog, and to tell his father to come over, and that he went home and told his father. On the seventh of May, 1883, the defendant went to where

Hidinger was at work, in his own field, and was about to take the dog away, when a quarrel ensued, resulting in defendant's firing the fatal shot. The facts and circumstances of this quarrel are sufficiently stated in the former opinion, and need not be repeated.

*W. A. Spurrier*, *Thos. L. Maxwell*, and *J. L. Brown*, for appellant.

*John Y. Stone*, Attorney General, *John W. Bixby*, County Attorney, and *H. M. Towner*, for the State.

GIVEN, J.—I.  Following the order pursued in the arguments, we first consider the overruling of defend-
1. Murder: evidence.
ant's objections to testimony. Willis Hidinger, having stated on cross-examination that his father, the deceased, had reasons, he said, why he wanted Mrs. Wremwick to take the dog, was asked on re-examination what reasons his father gave, to which he answered: "The objections were that she was not in a fit condition to quarrel over a dog. She was evidently in a family way." The ownership of the dog, and what each knew as to the claim made by the other, was important in connection with the quarrel of May 7. The reason given by deceased for allowing Mrs. Wremwick to take the dog, not being in the presence nor brought to the knowledge of defendant, was not admissible to charge him with knowledge that deceased claimed the dog. Defendant claimed that the fact that deceased allowed the dog to be taken was evidence that he made no claim to it. It was competent, therefore, to rebut this by showing any other reason he had for allowing Mrs. Wremwick to take it. It does not tend to charge defendant with knowledge, but does tend to disprove the inference contended for. The reasons were given at the time, and were a part of the transaction.

II.  William Hannah was called to testify to dying declarations made by the deceased. It is admitted that,

2. ——: ——: *dying declarations.* at the time deceased made the declarations to Hannah, he was in such condition of mind as to entitle them to be received as dying declarations. The statement complained of was : "Bill, it is pretty hard to go through the whole war, and come home and be murdered on my own farm." Defendant's motion to strike out this part of the testimony, "as not detailing the transaction had in that field, but simply gives a conclusion," was overruled. Hannah was recalled on part of the state "for further examination omitted by oversight." He was permitted to testify that, at the time deceased made the statement to him, he also made a statement in relation to threats that had been made against him by the defendant, prior to the time of the shooting, in connection with the cattle transaction, and that he did not give any dates. On defendant's objection, he was not permitted to state what deceased said.

Dying declarations are statements of material facts concerning the cause and circumstances of homicide made by the victim, under solemn belief of impending death. They are restricted to the act of killing, and to the circumstances immediately attending it, and forming a part of the *res gestæ*. When they relate to former and distinct transactions, and embrace facts or circumstances not immediately illustrating or connected with the declarant's death, they are inadmissible. They are admissible only as to those things to which the deceased would have been competent to testify. They must relate to facts, and not to mere matters of opinion or belief. 6 Am. & Eng. Cyclop. Law, 123 ; *State v. Clemons*, 51 Iowa, 274. The declaration, "Bill, it is pretty hard to go through the whole war, and come home and be murdered on my own farm," is not a statement of any fact concerning the cause and circumstances of the homicide, nor of any circumstances concerning it. It is not a statement to which the deceased would have been competent to testify, but a mere exclamation as to the hardship of his then situation.

The statement does not refer to the defendant, nor to any fact or circumstance connected with the killing. As stated, dying declarations must relate to facts, and not to mere expressions of opinion or belief. If the word "murdered" was used as expressing the degree or character of the homicide, then it is an expression of opinion. If not used in that sense, then it was the statement of an uncontroverted fact, to-wit, that he expected to die in consequence of the wound. The threats were not made at the time of the homicide, but prior thereto. How long prior, was not stated ; but it appears from other testimony that the quarrel about the cattle had occurred nearly a year before, and that no other quarrels had occurred between that time and the day of the homicide. Surely, these threats were not a statement of anything forming a part of the *res gestæ*, but of a former and distinct transaction. "The rule that dying declarations should point distinctly to the cause of death, and to the circumstances preceding and attending it, is one that should not be relaxed. Declarations, at the best, are uncertain evidence, liable to be misunderstood, imperfectly remembered and incorrectly related. As to dying declarations, there can be no cross-examination. The condition of the declarant in his extremity is often unfavorable to clear recollection, and to the giving of a full and complete account of all the particulars which it might be important to know. Hence all vague and indefinite expressions, all language that does not distinctly point to the cause of death and its attending circumstances, but requires to be aided by inference or supposition in order to establish facts tending to criminate the respondent, should be held inadmissible." *State v. Center*, 35 Vt. 378.

We are clearly of the opinion that this testimony was improperly admitted. While it is true there was no question but that the defendant inflicted the mortal wound, and the statements testified to contain nothing as to the facts or circumstances of the homicide, and

were, therefore, immaterial, yet we cannot say that the defendant was not prejudiced thereby. While the jury may have regarded the statement of deceased as to the hardship of his situation as immaterial, we cannot say the same as to statements that threats had been made against him. Our conclusion is that the court erred in overruling defendant's motion to strike out the statement from the testimony, and in admitting the statement as to threats.

III. The appellant contends that the instruction defining a "reasonable doubt" is erroneous, in that it
3. ——: reason- directs the jury that, if a fair examination
able doubt: of all the evidence raises a doubt, they
instructions.
should acquit, while it should have been that, if a fair examination of all the evidence fails to remove reasonable doubts from the mind, they should acquit. This presupposes the existence of reasonable doubts, and that it is the office of evidence to remove them, while the true theory is that until the testimony is heard the jury have no opinion, and consequently no doubts. The doubt that acquits is a reasonable doubt that exists in the mind after all the testimony is heard and considered. The instruction given will not bear the construction placed upon it, and is in harmony with repeated decisions of this court.

IV. Appellant contends that the court erred in limiting the inquiries to murder in the second degree
4. ——: instruc- and manslaughter; that, under the indict-
tions as to ment and evidence, they might have con-
lesser offen-
ses. victed of lesser degrees, as of assault to inflict great bodily injury, assault and battery or simple assault. Is is true that these offenses were embraced in the charge of murder; but whether it is necessary or proper for the court to so instruct depends on the facts of the case. *State v. Cole*, 63 Iowa, 695; *State v. Mahan*, 68 Iowa, 305; *State v. Froelick*, 70 Iowa, 213. The facts in this case are identical, so far as this question is concerned, with those in *Cases of Mahan and Froelick*. There is no question but that

the defendant inflicted the mortal wound. The only question is whether he did so unlawfully. If unlawfully, he is guilty of murder in the second degree, or manslaughter. If not, then he is not guilty. There was no evidence whatever on which to base a conviction of any lower degree than manslaughter.

V. Following the contention just considered, it is urged on behalf of appellant that the court erred in submitting the inquiry as to guilt of manslaughter. It is zealously argued that the defendant was either guilty of murder in the second degree, or not guilty. It is enough so say on this proposition that it was possible for the jury, after considering all the testimony, to have a reasonable doubt as to defendant's guilt of murder in the second degree; and, in that case, it was their duty, as instructed, to acquit him of that charge, and then decide as to his guilt of manslaughter. There are so many phases of the testimony to justify that result, and the verdict returned, that it would have been a grave error not to have instructed as to manslaughter.

VI. In defining "manslaughter" the court gave full definition, including involuntary manslaughter. In defining "self-defense" the court included a statement of the right to defend the person, dwelling or property. It is contended that there was nothing calling for an instruction as to involuntary manslaughter, or the right to defend one's dwelling. The definitions were plain and correct. They could not have been made more so by omitting the parts complained of. Indeed, they are indispensable to full definition, and could not be misunderstood to defendant's prejudice. Without following the points argued further in detail, we say that we have examined the instructions with care in respect to the errors complained of, and to any that might appear, and our conclusion is that they fully and fairly presented the issues and law of the case to the jury.

VII. For the errors in admitting testimony as to the so-called "dying declarations," the judgment of the district court is reversed. It is unnecessary to notice other questions presented in the record, as they will not arise on a retrial. REVERSED.