STATE OF IOWA, Appellee, v. LAWRENCE O. FLORY, Appellant.

**HOMICIDE:** Evidence—Sufficiency. Evidence reviewed, and held to
1    present a jury question on the issue of felonious homicide by means
of poison.

**EVIDENCE:** Documentary Evidence—Certificate of Death—Privi-
2    leged Communications. An official certificate of death is competent
evidence in a proper case, notwithstanding the plea that it nullifies
the protection which the law throws around privileged communica-
tions.

**EVIDENCE:** Documentary Evidence—Public Records—Presumption
3    Attending Certified Copies. The signature to what purports to be
a certified copy of a certificate of death, said certificate bearing an
impression of what purports to be the official seal of the office of
the registrar of vital statistics, is presumptively genuine.

**CRIMINAL LAW:** Other Offenses—State of Mind. On a charge of
4    murder of a wife by her husband, evidence of acts of sexual inter-
course between the husband and another woman *shortly after* the death

of the wife is admissible on the issue of the defendant's state of
mind toward his wife. '

**TRIAL: Instructions—Applicability to Evidence.** Instructions on a
theory which is without support in the evidence are properly
omitted.

**CRIMINAL LAW: Reasonable Doubt—Absence of Evidence.** In-
structions on the subject of reasonable doubt should embrace the
thought that such doubt may arise from the *absence of* evidence; but
the omission of such thought is not necessarily reversible error.

**TRIAL: Instructions—Cautionary Instructions.** Cautionary instruc-
tions reviewed, and disapproved.

*Appeal from Keokuk District Court.*—D. W. HAMILTON, Judge.

JUNE 24, 1924.

THE defendant was convicted in the court below of the
crime of murder in the first degree, and sentenced to imprison-
ment in the penitentiary at Fort Madison for life; and he ap-
peals.—*Reversed.*

*Stockman & Baker, J. A. Devitt,* and *F. M. Beatty,* for ap-
pellant.

*Ben J. Gibson,* Attorney-general, and *J. H. Wyllie,* for ap-
pellee.

STEVENS, J.—I. The indictment, in two counts, charged
the appellant with the murder of Alvina Flory, his wife, by
poisoning. The evidence relied upon for conviction was quite
largely circumstantial. Deceased became vio-
lently ill on February 2, 1922, and was attended
by Dr. Wall, the family physician. She again
became ill on the 20th and 27th of the same month, and on
March 9th. On each of said dates she was visited by her physi-
cian. Her death occurred in the evening, some time before 11
o'clock, on the last mentioned date. Dr. Wall was called after
Mrs. Flory was discovered dead in her bed, and examined the
body.

1. HOMICIDE: evi-
dence: suffi-
ciency.

Upon his first visit, Dr. Wall found deceased suffering from severe pains in the stomach and bowels. He visited her again the following day, when he diagnosed her ailment as gastric ulcers, and prescribed what is known as the "Sippy treatment." This treatment consisted of the administration of medicine in the form of powders,—the powders to be taken in alternate doses, with milk and cream in equal proportion. One dose was composed of sodium bicarbonate and magnesia oxide, and the other of sodium bicarbonate and calcium carbonate. The powders were white in color. At first, the powders were made up by the physician; but later, they were supplied in two separate bottles, and the doses were measured by appellant, and frequently administered to the deceased by him. This treatment was continued until her death. The doctor was called about midnight on February 20th, and, upon his arrival, found deceased suffering "great distress, and was apprehensive of some calamity." She cried a great deal, and "a convulsive condition developed." The patient was quieted by hypodermic injections of morphine. Her condition on March 9th, when Dr. Wall called about 3 P. M., appeared to be much improved. Her stomach was better, and her heart and lungs were normal. A death certificate made out by Dr. Wall and forwarded to the state department of vital statistics gave the cause of death as acute myocarditis.

The body was exhumed on April 13th, and, in the presence of Dr. Wall, Dr. Heald, of Sigourney, and Harrison Shaver, the sheriff of Keokuk County, and two undertakers, the vital organs were removed, placed in four glass jars, which were sealed, and the whole delivered by the sheriff to Dean Teeters, of the College of Pharmacy at Iowa City, for examination. The examination made by Dean Teeters disclosed the presence in the stomach and bowels of more than sixty grains of bichloride of mercury. The condition of these organs quite conclusively indicated that death resulted from the effects of the bichloride of mercury. All of the other vital organs were in a healthy condition.

The State claims that the poison was administered to deceased by appellant; and evidence was introduced to prove that, on January 22, 1922, he purchased an ounce of bichloride

of mercury of Nathan Whiting, a druggist at Iowa City, giving as a reason for the purchase that he desired to use it to kill dogs. The poison register which showed the above sale was signed "Chas. Jones, Wellman." Whiting identified appellant as the purchaser of the poison, and a handwriting expert gave it as his opinion that the handwriting on the register was that of appellant.

Bottles containing some of the fluid used in embalming the body of deceased were also chemically analyzed by Dean Teeters, and found to contain bichloride of mercury. He testified that the quantity of bichloride of mercury in the fluid used by the undertaker in embalming the body did not, however, substantially exceed twenty-five grains. .

Appellant, as a witness in his own behalf, denied that he purchased the bichloride of mercury of Whiting at Iowa City, or that he administered poison to his wife. The claim is made by appellant that the evidence was insufficient to convict; but we shall not review the record on this point, as we deem the contention without substantial merit.

II. Counsel for appellant sought to cross-examine Dr. Wall, who was called as a witness for the State, as to the cause of death, and to introduce in evidence a certified copy of the death certificate made out and forwarded by him to the registrar of vital statistics, as a part of the cross-examination, but was not permitted to do so. Later, the certified copy of the death certificate was offered in evidence, as a part of appellant's case in chief; but the court again excluded it,—this time upon the objection of the county attorney that it was incompetent. The first ruling was clearly correct, but the latter ruling cannot be sustained.

2. EVIDENCE: documentary evidence: certificate of death: privileged communications.

Dr. Wall was not examined in chief as to the cause of death, and hence this could not be made the subject of cross-examination.

Chapter 222, Acts of the Thirty-ninth General Assembly, provides for a department of vital statistics, and makes the secretary of the state board of health the registrar of such department. The act makes it the duty of physicians to prepare

and forward to the registrar certificates of births and deaths, and to use a form prepared and furnished by that department. Section 21 of this act provides that:

"Any such copy of the record of a birth or death when properly certified by the state registrar, shall be prima-facie evidence in all courts and places of the facts therein stated."

It is argued by counsel for the State that the certified copy of the certificate in question was inadmissible for the following reasons: (a) That it violates the rule protecting privileged communications; (b) that it is not a public document, nor a copy thereof; (c) that no evidence was offered to prove that the officer signing the same was the registrar or assistant registrar of the department of vital statistics; and (d) that the certificate is not properly authenticated. Statutes authorizing the introduction in evidence of certified copies of public records have been uniformly upheld by the courts, and the only question here is whether the certified copy offered was properly authenticated. The rule which protects privileged communications has no application to public records. The requirements of the law that a public record be kept could not be complied with if the privilege were extended thereto, and statutes authorizing the introduction of certified copies thereof in evidence would be a nullity. Upon this question, see *Bozicevich v. Kenilworth Merc. Co.*, 58 Utah 458 (17 A. L. R. 346, and note appended thereto); 5 Wigmore on Evidence (2d Ed.), Section 2385-a.

Section 4643 of the Code of 1897 provides as follows:

"In the cases contemplated in the last ten sections, the signature of the officer shall be presumed to be genuine until the contrary is shown."

It is true that the certificate in question is signed by the assistant registrar, the signature of the registrar being affixed thereto by the use of a rubber stamp. The document bears the impression of the seal of the department of vital statistics. Section 2 of Chapter 222 authorizes the registrar to appoint assistants. It is a general rule that the signature attached to a document bearing an impression purporting to be an official seal is presumed to be genuine. 3 Wigmore on Evi-

3. EVIDENCE: documentary evidence: public records: presumption attending certified copies.

dence (2d Ed.), Section 1679. The exhibit was properly authenticated, and clearly admissible in evidence.

It is also urged by the State that the exclusion of this instrument was without prejudice to appellant. This is not necessarily true. The evidence bore directly upon a vital point in the case. Its probative force might have been easily overcome, it is true, but this does not determine its admissibility. The exhibit should have been received in evidence, and the jury given an opportunity to weigh it, with all the other facts and circumstances bearing upon the cause of death. We cannot say that its exclusion was without prejudice.

III. Olive Mae Noremberg, who was employed in the home of appellant during his wife's illness, testified that she had intercourse with him in the second story of his home on February 22, 1922, and various other days at the house or in the barn. She also testified that she had intercourse the day of, and shortly after they returned from, the funeral. Another witness was permitted to testify that appellant told him, sometime in March, after Alvina's death, that he had intercourse with another girl by the name of Rowe, who was employed as a servant in his home, but not until after the funeral. There is some confusion in the testimony of this witness as to which of the parties named appellant referred to. The State concedes that, if it was Miss Rowe, the evidence was not admissible. The purpose of this testimony was to show the state of appellant's mind toward his wife at the time of her death. Under our previous holdings, the testimony as to acts of sexual intercourse by appellant with another woman prior to and at or about the time of his wife's death was admissible. *State v. Wilson,* 189 Iowa 1057; *State v. Cole,* 63 Iowa 695; *State v. Browman,* 191 Iowa 608; *State v. O'Donnell,* 176 Iowa 337.

The doubt, if any, as to the admissibility of the evidence of acts of intercourse is confined to what the witness testified occurred on the day of, and shortly following, the funeral. What then occurred, it appears to us, was so closely connected in point of time with the series of acts immediately preceding the death as to be admissible in evidence, as bearing upon the state

4. CRIMINAL LAW:
other offenses:
state of mind.

of appellant's mind toward his wife at the time the crime was committed.   These acts tended strongly to indicate an almost total lack of respect or affection on his part for his wife.   Evidence of immoral conduct, or of the commission of other offenses, was not admissible unless it had some bearing upon appellant's mental attitude toward his wife at the time of her death.   This evidence did not tend to prove the crime charged, but it did tend to overcome the presumption that naturally arises from the relation of husband and wife.   It was admissible for the purpose indicated.   The jury should be instructed as to the purpose for which evidence of this character is admissible.

It also appeared from other evidence offered by the State that appellant and deceased had not at times lived harmoniously together, and that appellant at one time left her, and sought the advice of an attorney as to whether he had grounds for a divorce.   Upon his being advised that he did not, the marriage relation was resumed.   The court excluded certain evidence offered by appellant upon this issue, upon the grounds that it was a mere self-serving declaration.   We think the ruling was proper, and, in any event, without prejudice.

The remaining grounds relied upon for reversal which we desire to notice relate to the instructions to the jury.

IV.   The court, in Paragraph 11 of its charge, instructed the jury that, if deceased came to her death by any other cause than that of bichloride of mercury, or if they had a reasonable doubt as to whether she came to her death by some other cause, the defendant should be acquitted.   The objection to this instruction is that it ignores the possibility that the poison may have been voluntarily or accidentally taken by the deceased, or administered to her by mistake.   No evidence from which the jury could have found that the poison was taken voluntarily by deceased, or that it was administered to her by accident or mistake, was introduced.   The criticism of the instruction is without merit.

5. TRIAL: instructions: applicability to evidence.

V.   In instructing the jury on the subject of reasonable doubt, the court said:

"The doubt contemplated is found in reason, one that

fairly, naturally, and spontaneously arises in the mind out of the evidence,'' and did not add the phrase ''or from the want of evidence.''

We have repeatedly held that reasonable doubt may well arise from the lack of evidence, and that an instruction which omits this element will not be approved. *State v. Smith*, 194 Iowa 639; *State v. Smith*, 192 Iowa 218; *State v. Tonn*, 195 Iowa 94. It does not necessarily follow, however, that a reversal would result on this ground alone.

6. CRIMINAL LAW: reasonable doubt: absence of evidence.

Instructions 15 and 23, to which exceptions are taken, are of doubtful propriety. ·

VI. The court included in its charge to the jury a cautionary instruction, in which the following language was used:

''Every juror should listen to the arguments of other jurors, with a disposition to be convinced by them; and if any of the jurors differ in their view of the evidence from a larger number of their fellow jurors, such differences of opinion should induce the minority to doubt the correctness of their own judgment, and cause them to scrutinize the evidence more closely and re-examine the grounds of their opinion.''

7. TRIAL: instructions: cautionary instructions.

A portion of the language quoted above has been repeatedly disapproved by this court. *Armstrong v. James & Co.*, 155 Iowa 562; *Clemens v. Chicago, R. I. & P. R. Co.*, 163 Iowa 499; *Mt. Hammil St. Sav. Bank v. Hughes,* 196 Iowa 861. The *Clemens* case was reversed on account of an instruction to the same effect. The instruction was disapproved in *State v. Mulhollen*, 173 Iowa 242, but we declined to reverse, for the reason that the verdict had the support of the overwhelming weight of the evidence. Whether the judgment in this case should be reversed on account of its instruction alone, we shall not undertake to say. It is sufficient that the instruction has repeatedly had the disapproval of this court.

Other points are raised and discussed by counsel for appellant. None of them, in our judgment, present substantial grounds for reversal, and should not arise upon a retrial of the case. We shall not, therefore, give them further consideration.

We have already indicated that the judgment below must be reversed, and it is so ordered.—*Reversed.*

ARTHUR, C. J., DE GRAFF and VERMILION, JJ., concur.