STATE OF IOWA, Appellee, v. PEARL JOHNSTON, Appellant.

No. 42924.

June 19, 1936.

Rehearing Denied October 2, 1936.

Rolla Shewmaker, O. M. Slaymaker, R. E. Killmar, and D. D. Slaymaker, for appellant.

Edward L. O'Connor, Attorney General, Walter F. Maley, Assistant Attorney General, Emmet R. Warin, County Attorney, and Charles J. Lewis, Special Prosecutor, for appellee.

DONEGAN, C. J.—Under an information charging her with the crime of murdering her husband, Herbert T. Johnston, the defendant was tried and convicted of the crime of manslaughter. Thereafter, within due time, she filed motion for new trial, exceptions to instructions given, and exceptions to refusal to give instructions requested, all of which were overruled by the trial court. Judgment was entered sentencing her to an indeterminate term in the Women's Reformatory at Rockwell City, and from this judgment and all adverse rulings of the court, the defendant appeals.

Appellant sets out 28 separately numbered errors relied upon for reversal. Many of these alleged errors will be grouped and considered together under separate divisions in this opinion.

The first error upon which the appellant relies for reversal is the refusal of the trial court to allow evidence to be introduced to impeach the testimony of the witness Dr. J. T. Stanton. The defendant was accused of having shot her husband with a revolver in her home at Mt. Ayr about 10:30 o'clock on the evening of June 7, 1934. Shortly after shooting her husband, the defendant also shot herself. Both defendant and her husband, while he was still living, were placed in an ambulance and started for a hospital at Creston. Dr. J. W. Hill and Dr. J. T.

Stanton were riding with them in this ambulance. On the way to Creston the defendant's husband died. The witness, Dr. J. T. Stanton, who was sitting alongside of defendant, testified for the state as to statements made by the defendant while on the way from Mt. Ayr to Creston. On cross-examination, Dr. Stanton was asked whether he told the defendant about her husband's death while proceeding in the ambulance from Mt. Ayr to Creston, and he answered that "Dr. Hill did." In answer to a question as to whether he had testified before the coroner's jury on the day following Herbert Johnston's death, he testified that he had. He was then asked: "Q. Did she know when he died?" And to this he answered that she did. He was then asked whether he did not testify before the coroner's jury as follows:

"Q. Was this question asked you: 'Q. Did she know when he died?' A. Yes, sir.

"Q. And what answer did you make to it? A. That she did.

"Q. Doctor, didn't you make this answer: 'I think we told her. I don't know whether it registered or not.' A. I don't remember ever saying the last part of that."

After some delay in securing the appearance of Dr. Hill and some examination as to the signing of the minutes of the evidence taken before the coroner's jury, the examination of Dr. Stanton proceeded as follows:

"Q. Now, Dr. Stanton, what do you say now as to whether or not this question was asked you before the coroner's inquest: 'Q. Did she know when he died? A. I think we told her. I don't know whether it registered or not.' A. I don't remember saying the last question—the last part of that question.

"Q. Do you deny that you said it? A. No.

"Q. If you did say it, you meant by that that you didn't know whether she understood about it or not? A. She might not have heard it.

"Mr. Charles Lewis: We object to the question as leading.

"The Court: Overruled. (State excepts.)

"A. She was laying on the floor.

"Mr. Slaymaker: Q. But if you said, 'I don't know whether it registered or not,' what did you mean by it? A. I meant she might not have heard the question.

"Q. Did you mean that or did you mean that you didn't know whether she was in condition to realize it or not? A. I know she was in condition to realize it."

Dr. Hill was called as a witness in behalf of the defendant, and, in connection with his examination as to testimony given by Dr. Stanton before the coroner's jury, he was asked the question: "Q. I will ask you also, Doctor, whether at that time and in that examination and as a part of that inquest, Dr. Stanton answered, 'I think we told her. I don't know whether it registered or not.'"

■■■ This question was objected to on the ground that it called for testimony that was not the best evidence and that no grounds had been laid for impeachment. The objection was sustained, and the witness Dr. Hill was not allowed to answer. It is claimed that in thus ruling the court committed reversible error, for the reason that the testimony sought to be elicited by the question asked was proper evidence for impeachment, and that it should not have been refused on the ground that it was not the best evidence. We think the court erred in holding that the testimony was not admissible because it was not the best evidence. State v. Mushrush, 97 Iowa 444, 66 N. W. 746; State v. Dean, 148 Iowa 566, 126 N. W. 692; State v. Kimes, 152 Iowa 240, 132 N. W. 180.

■■■ However, we find no prejudicial error in the court's ruling, because the testimony sought was not properly admissible as impeaching evidence. Dr. Stanton at no time denied that, in testifying at the coroner's inquest, he had said: "I think we told her. I don't know whether it registered or not." What he said was: "I don't remember ever saying the last part of that." "I don't remember saying the last question—the last part of that question." On further being asked whether he denied having made the statement, he said: "No." If the record showed no more than this, we think it would be insufficient for the introduction of impeaching testimony, because there was nothing contradictory or inconsistent between the testimony of this witness at the coroner's inquest and the testimony given by him upon the trial of the case. Counsel for appellant, however, pursued the cross-examination of this witness further, and asked him what he meant by the statement, "I don't know whether it registered or not." To this question the witness answered: "I

meant she might not have heard the question." Counsel for appellant then proceeded to ask the question: "Q. Did you mean that or did you mean that you didn't know whether she was in condition to realize it or not?" And to this the witness answered: "I know she was in condition to realize it." Even if the witness had made the statement before the coroner's jury concerning which he was examined, he not only did not deny it, but, on being pressed for an explanation by the counsel for appellant, he told just what he meant by the expression alleged to have been used by him at the coroner's inquest. We find nothing prejudicial in the refusal to admit the testimony thus offered for impeachment purposes.

■■■ II. It is next contended by the appellant that the court erred in permitting the introduction of the testimony of Dr. Stanton as to statements made to him by the defendant while on the way from Mt. Ayr to Creston, for the reason that these statements were made at a time when the witness Dr. Stanton was acting in his professional capacity as a physician for defendant, and were confidential communications. Code, section 11263, provides:

"No practicing attorney, counselor, physician, surgeon, * * * shall be allowed, in giving testimony, to disclose any confidential communication properly intrusted to him in his professional capacity, and necessary and proper to enable him to discharge the functions of his office according to the usual course of practice or discipline."

Appellant relies on Battis v. Railway Company, 124 Iowa 623, 626, 100 N. W. 543, 545. In that case "the interrogatories propounded to the physician were intended to elicit from him certain facts respecting the condition of plaintiff, and it is manifest that whatever knowledge the witness possessed was acquired from the statements made to him by plaintiff, and from his own examination and observation." The questions asked by the physician and the answers given by the patient in that case had reference to the condition of the patient, and might readily be construed as "necessary and proper to enable him [the physician] to discharge the functions of his office." Where, however, the questions asked by the physician and the answers given by the patient have reference, not to the patient's condition, or to anything that may enable the physician to properly treat the pa-

tient, but to matters which have no connection with the condition of the patient whom the physician is called upon to treat, we do not think that such communications are confidential. State v. Masters, 197 Iowa 1147, 198 N. W. 509; Grossnickle v. Avery (Ind. App.) 152 N. E. 288; Koskovich v. Rodestock, 107 Neb. 116, 185 N. W. 343.

■■■ III. There is sufficient in the evidence to show that the defendant had secured certain letters from the pocket of her husband's coat several months before June 7, 1934; that these letters were written by one Alma Pine, a woman with whom he was keeping company in Des Moines, Iowa; that they were mailed by her to a woman friend of hers, through whom they were delivered to the defendant's husband; that the defendant's husband was infatuated with this woman, Alma Pine, and was neglecting his wife and destroying her home life; that some time after the discovery of these letters by defendant the decedent separated from her and left the home for a short time; that he returned, promised to reform, and to cease his attentions to Alma Pine; and that, at his request, these letters were destroyed. The evidence further shows that immediately after the destruction of these letters the defendant's husband told her that he had merely returned for the purpose of obtaining these letters and destroying them, and that he was going to continue acting as he pleased. The defendant offered her own testimony as to the contents of these letters, and also the testimony of her sister and brother-in-law, who had seen and read them; but, on the objection of the state, this evidence was excluded. It is the contention of the defendant that the letters contained endearing statements; that from the statements contained in them improper relations between the defendant's husband and Alma Pine could reasonably be inferred; that the writer of the letters stated that she could hardly wait for the time until defendant's husband would get rid of "old lady Johnston so that they could get married." And it is contended further that these letters were admissible as tending to show the relationship between defendant's husband and Alma Pine, his motive for wanting to get rid of his wife, and the reason why he would be the aggressor in the transaction in which he lost his life. There is nothing in the evidence to show that these letters were talked about or had anything to do with the particular quarrel which resulted in the shooting and death of defendant's husband. There was ample

evidence in the case from both the defendant and other witnesses to support the defendant's contention that her husband had become infatuated with Alma Pine; that he had become addicted to drink; that he had neglected the defendant, repulsed her, used unkind and blasphemous language toward her, told her in substance that he wanted to get rid of her, and had used violence toward her and threatened her life. previous to the occasion on which he was shot by defendant. The letters in question were not the letters of the defendant. There is nothing in them tending to show any plot between Herbert Johnston and Alma Pine to do physical violence to, or take the life of, the defendant. Even if the evidence as to the contents of these letters was admitted, it could add nothing to the evidence of the defendant and other witnesses in regard to the matters concerning which it is claimed such evidence was competent. State v. Schumann, 187 Iowa 1212, 175 N. W. 75. We find no prejudicial error in the exclusion of this evidence.

IV. It is contended that the court erred in refusing to admit the testimony of the defendant in reference to what occurred upon an evening in February, 1934, when she pleaded with her husband to become reconciled with her, to give up Alma Pine and quit drinking, and when her husband, who was then drunk, repulsed her. It is claimed that this evidence should have been admitted, because it tended to show the decedent's attitude toward the defendant, his affection for Alma Pine, his lack of love and disregard for his wife, and thus bore directly on the question of motive and who was the aggressor at the time of the shooting on June 7, 1934. We think the evidence offered was so remote in time that it might properly have been excluded for that reason alone. Ample evidence was admitted by the court to show the decedent's attitude toward his wife, his disregard of and lack of love for. her, his habits of drinking, his infatuation for Alma Pine, and his abuse and threats against the defendant. The trial court was endowed with some discretion as to how much evidence might be received along these lines, and it was not obliged to receive evidence in detail as to all the incidents happening during the months preceding the shooting of her husband by the defendant.

. . V. What has just been said, we think, is also applicable to the fifth alleged error, in refusing to admit evidence of the defendant herself as to an increase in her husband's addiction to

drunkenness; to the sixth alleged error, in refusing to admit evidence of a witness who saw decedent with a woman whom the decedent admitted to the witness was Alma Pine; to the errors claimed in assignments 8 to 14 inclusive, in refusing to admit evidence of the defendant's sister, Gladys Elliot, in regard to conversations which took place and things that occurred in the witness' house in Des Moines in February, 1934; and to the error alleged in refusing to admit testimony as to matters which occurred at the home of the witness in Des Moines in April, 1934, when the defendant and her husband were present.

VI. Defendant testified in her own behalf as to what occurred at the time of the shooting, and stated that the first shot was fired accidentally and without intention on her part, and when she was pointing the revolver toward her husband and attempting to bluff him from pursuing the attack which he was making upon her. The defendant offered an instruction to the effect that, if the shot that killed the defendant was fired accidentally, the jury should acquit the defendant. This instruction was refused. Defendant also asked an instruction which told the jury that: "In the case at bar the evidence shows that one of the shots fired at Herbert Johnston produced a fatal wound, resulting in death, and that the other two shots produced no fatal wound"; and that: "If the State has failed to prove that it was not the first shot that killed Herbert Johnston, then the defendant is not guilty of any offense charged in the indictment and you will so find in your verdict." Complaint is made of the refusal of the court to give these instructions. We fail to find anything in the evidence from which it could be said by the court, as a matter of law, that one of the shots fired at Herbert Johnston by the defendant produced a fatal wound and that the other two shots produced no fatal wound. The evidence was generally to the effect that the decedent died as the result of hemorrhages from the gunshot wounds inflicted upon him, and there is nothing in the evidence to indicate clearly whether the hemorrhages which caused death came from any one or from two or from all of the three wounds.

The court, in its instruction 10½, told the jury: "You are instructed that before the defendant can be convicted of the crime of murder in the first degree, murder in the second degree, or manslaughter, the state must prove beyond a reasonable

doubt that the shot which it is claimed killed the decedent was fired by the defendant intentionally and not accidentally."

. There was no error in refusing to give the requested instructions. We think instruction $10\frac{1}{2}$ clearly stated the law as to the shot claimed to have been fired by defendant accidentally.

▌▌ VII. Defendant complains of the court's refusal to give the jury further instructions requested by defendant, as to the first shot being accidental; as to defendant's right to point the revolver at decedent, if she had reason to apprehend, as a reasonable woman, that he would commit a felonious assault upon her; and as to what the jury might take into consideration in determining whether or not the revolver was intentionally discharged by the defendant. We think the matters sought to be covered by these instructions were sufficiently covered by the court's instructions, and that there was no error in the refusal to give the instructions requested.

VIII. Error is alleged in the action of the court in admitting evidence of four witnesses as to statements made by the decedent when they arrived at the home of the decedent and defendant a few minutes after the shooting occurred. These statements were not made in the presence of the defendant; some of them were made in response to questions asked the decedent by some of the witnesses; and some of them appear to have been volunteered by the decedent. Some of the statements of the decedent, to which objection was thus made, were in substance: "I am shot"; "she shot me"; "I didn't think she'd do it"; "she shot me"; "why did she do it?" "why did I come home?" There was further evidence tending to show that, when these statements were made, the decedent stated that he was about to die or that he was going; that he called for his son and gave instructions to his son as to business and property matters. It is the contention of the appellant that none of these statements were either part of the res gestæ or dying declarations. While this may be true as to some of the statements, we do not think it is true as to all of them. Parts of these statements were stricken out upon motion of the defendant, and, even if some of the statements not stricken out were not part of the res gestæ or were not dying declarations, we find nothing in these statements that would be so prejudicial to the defendant as to make the action of the court, in admitting them or refusing to strike them out, prejudicial error.

■■■ IX. Appellant complains of the refusal of the court to submit instructions offered by her as to included offenses of assault with intent to commit manslaughter, assault with intent to commit great bodily injury, assault and battery, and simple assault. The evidence was not in dispute as to the deceased having died as the result of the wounds inflicted by the defendant. There was no evidence from which the jury could have found that, if the defendant were guilty at all, she was guilty only of assault with intent to commit manslaughter, assault with intent to commit great bodily injury, assault and battery, or simple assault. The defendant was clearly guilty of a homicide committed with a deadly weapon; such homicide was either criminal or it was excusable. If it was criminal, she could not have been guilty of less than manslaughter. If it was excusable, the defendant was not guilty of any crime at all. State v. Klute, 160 Iowa 170, 140 N. W. 864; State v. Mahan, 68 Iowa 304, 20 N. W. 449, 27 N. W. 249; State v. Perigo, 80 Iowa 37, 45 N. W. 399; State v. Cole, 63 Iowa 695, 17 N. W. 183; State v. Dyer, 147 Iowa 217, 124 N. W. 629, 29 L. R. A. (N. S.) 459; State v. Bone, 114 Iowa 537, 87 N. W. 507.

■■■ X. Complaint is made by the defendant of the use of the term "*necessary* self-defense" in the court's twelfth instruction. Complaint is also made because the court in said instruction told the jury that it must have appeared *to the defendant* that the danger was so urgent that the use of such dangerous and deadly weapon was absolutely necessary. It is claimed that the use of the term "*necessary* self-defense," and the statement that the danger must have appeared *to the defendant* to be urgent, are incorrect statements of the law, and that they are inconsistent with the remaining portion of the instruction. The use of the term "*necessary* self-defense" is not of itself an error. In the case of State v. Thomas, 151 Iowa 572, 132 N. W. 51, this court refused to reverse because of the use of the term "necessary self-defense." In State v. Crawford, 66 Iowa 318, 23 N. W. 684, 685, we refused to reverse because of an instruction which told the jury that the taking of life might be justified "when it is absolutely necessary, or reasonably seems to be absolutely necessary to do so."

The jury was further told in instruction 12 that: "In this case, if you find from the evidence that the defendant was assaulted by the said Herbert Johnston, she had a right to repel the

attack using sufficient force for that purpose. And if you find that, acting as an ordinarily prudent and cautious person under the circumstances, the defendant believed that the deceased was about to take her life or inflict upon her a great bodily injury, then she was not required to make nice calculations and draw nice distinctions as to how much force she might use to protect herself from such danger, but she would be justified in using such force as an ordinarily prudent and cautious person, acting upon appearances, would in a like situation probably exercise.''

We think that, when the whole instruction is read and considered together, there is no such prejudicial error in it as would justify a reversal. State v. Jackson, 156 Iowa 588, 137 N. W. 1034.

XI. Defendant excepted to the court's instruction No. 16, in which the jury was told: ''They (dying declarations) are admitted upon the theory that a person in a dying condition and who believes that he must soon meet his Maker, would have no motive to misrepresent, but might be supposed at such time and under such conditions to speak the truth without malice.''

Complaint is made as to this part of the instruction, because it is claimed that it is incorrect, and that it would cause the jury to get the impression that the testimony should be taken as true. In the same instruction, however, and immediately following the portion of the instruction above set out, the court told the jury that: ''You will consider such statements in connection with the other evidence in the case, and will give them such weight as you believe they are entitled to receive.''

Even if the instruction objected to be technically incorrect, we are unable to see how any of the statements to which the instruction refers could have been in any way prejudicial to the defendant.

XII. Finally, it is contended that the case should be reversed, because of what is claimed to be an oral instruction given to the jury. The record shows that, after the jury had been deliberating about 42 hours, it was called into the courtroom by the court and was addressed by the court as follows: ''All present. Gentlemen of the jury, the court has received a written communication signed by your foreman, as to certain aspects of this case, and he has brought you into court at this time in the presence of counsel for the defendant and in the presence of the defendant and also with the attorneys for the

State present, and he says to you at this time that he feels that he has already fully instructed you upon the questions which you have asked in this communication, and he does not feel that at this time he could give you any additional instructions that would be helpful. He realizes that it is an important case, but he does not feel that at this time he could say anything to you that would be any more helpful than what he has already said in the instructions which he has given you, and he feels that it is his duty under the law to ask you to retire for further deliberation, and he suggests that it might be helpful to you to read the instructions which the court has given you, again. He hopes that there may be a final agreement. You may now retire.''

We find nothing in the above statement made by the court that could in any way be prejudicial. Moreover, under the holding of this court in State v. Mullenix, 212 Iowa 1043, 237 N. W. 483, we do not think that the statement made by the court can properly be termed a verbal instruction.

This case is a very important one and the record is voluminous. We have read, not only the printed record as contained in the abstract of the evidence, the briefs and arguments, but also the transcript of the evidence. While there was ample evidence from which the jury, had it seen fit to do so, could have acquitted the defendant, there was also ample evidence to sustain the verdict rendered. The case was vigorously and ably contested, and there is nothing to indicate that it did not receive the most careful and unbiased consideration from the jury. Under the record presented, we are unable to find any prejudicial error, and the judgment and rulings of the trial court are therefore affirmed.—Affirmed.

All Justices concur.