**STATE of Iowa, Plaintiff-Appellee,**

v.

**Teresa Viola PLOWMAN,
Defendant-Appellant.**

No. 85–184.

Court of Appeals of Iowa.

Feb. 26, 1986.

847

Charles L. Harrington, Appellate Defender, and B. John Burns, Asst. Appellate Defender, for defendant-appellant.

Thomas J. Miller, Atty. Gen., Ann E. Brenden, Asst. Atty. Gen., Denver Dillard, Co. Atty., and Mary Vavroch, Asst. Co. Atty., for plaintiff-appellee.

Heard by OXBERGER, C.J., and DONIELSON and SNELL, JJ.

SNELL, Judge.

Defendant Teresa Viola Plowman was charged with second-degree murder. Plowman testified at trial that on the evening of June 4, 1984, her twenty-one month old daughter, Lacy, and another of her children were crying. She attempted to appease Lacy by giving her water, and then by changing her diaper. However, Lacy continued to cry. Plowman stated that at that time she began to carry Lacy back to the bedroom. The next thing she remembered she was standing over Lacy. After a few seconds, she recalled that "I had thrown her on the floor and then I stepped on her stomach." Plowman insisted that she did not know why she hurt Lacy, and that she did not act out of anger. However, Plowman did admit that she knew that a little child would be hurt if thrown to the floor. Plowman also recounted that in the spring of 1984 she had warned her husband that she was afraid she would "crack" and hurt one of the children because her temper overwhelmed her.

Plowman's neighbor testified that on June 4, 1984, Plowman ran to her house screaming, "You got to save my baby," and "I slammed her down and kicked her." Police officers testified that when they arrived at Plowman's home, Lacy was not breathing and was "a darker blue color." Plowman told the police that she had hit Lacy and "threw her down as hard as I could." The neighbor's daughter also testified that she heard Plowman admit that she hit the baby, threw her down and kicked her.

Lacy was kept alive by machines until June 8, 1984. When the machines were turned off she died immediately. An autopsy revealed that Lacy's death was caused by increased intracranial pressure, or swelling of the brain, brought about by acute trauma.

The State introduced photographs taken during Lacy's autopsy. Plowman objected to the State's manner of display of the photographs on the ground that their probative value was outweighed by the prejudice they would create in the minds of the jury. The court overruled the objection and the photographs were shown to the jury.

Prior to trial, Plowman filed a motion in limine alleging that certain testimony to be offered by the State violated Iowa Rule of Evidence 404(b). Plowman argued, in part, that testimony concerning specific prior acts was too remote in time to be relevant. The motion was denied. Several of Plowman's friends testified that they had observed Plowman use excessive physical force with Lacy prior to June 4, 1984. Over defense counsel's objection, Plowman's neighbor testified that she observed bruises on Lacy's face sometime before Christmas of 1983. The neighbor also stated that when she inquired about the bruises, Plowman burst into tears and stated, "you don't want to know." Another witness testified, over defense counsel's objection, that she observed Plowman strike Lacy on the head hard enough to leave red marks and bruises "almost every time she came over" to the witness's house (which was approximately twice a week). This witness also testified she had observed Plowman beat Lacy's chest solidly and

Lacy cower under Plowman's raised hand. Plowman objected to testimony from still another State witness which concerned an incident in which Plowman slapped Lacy when she was three months old and called her "a little bitch." The witness also testified that she observed Plowman place Lacy on her lap and bat her head back and forth. Plowman's husband also testified that Plowman had outbursts of temper in which she physically attacked Lacy.

During cross-examination of Plowman, the county attorney questioned Plowman as to whether she had made statements to correctional officers concerning alleged instructions given to her by her defense attorneys. Outside the jury's presence, defense counsel moved for a mistrial on the basis that this questioning amounted to prosecutorial misconduct. The trial court denied the motion for new trial.

Plowman filed a notice of insanity and diminished responsibility defenses prior to trial. Plowman then filed a motion for separate adjudication of law points arguing that the defense of diminished responsibility is relevant to the issue of whether she acted with malice aforethought. The trial court took the motion under advisement. During trial, Plowman withdrew the insanity portion of her notice of defense, but retained the defense of diminished capacity.

The trial court did not choose to instruct the jury on the issue of diminished responsibility. Defense counsel objected to the trial court's failure to instruct on the issue of diminished responsibility with respect to voluntary and involuntary manslaughter. Defense counsel did not object to the court's failure to instruct on the issue of diminished responsibility as to the malice aforethought element of second-degree murder. The jury found defendant guilty as charged.

On appeal, Plowman asserts that (1) defense counsel was ineffective in failing to object to the absence of an instruction on the issue of diminished responsibility as to the malice aforethought element of second-degree murder; (2) the trial court erred in admitting testimony from three witnesses concerning her abuse of Lacy because they were too remote in time to be relevant; (3) the trial court erred in denying her motion for mistrial based on the prosecutor's alleged misconduct while cross-examining her; and (4) the trial court erred in allowing the autopsy photographs to be shown to the jury.

**Diminished Responsibility Defense.** Plowman initially argues that her trial counsel rendered ineffective assistance by failing to object to the absence of a diminished responsibility instruction with respect to the malice aforethought element of second-degree murder.

 "In Iowa, proof of diminished mental capacity, or diminished responsibility, is admissible on the issue of the defendant's ability to form a *specific* intent, where such intent is an element of the crime charged. (citations omitted) Accordingly, diminished capacity is *not* recognized as a defense to crimes which require only a general intent. *See* 4 J. Yeager & R. Carlson, *Iowa Practice* § 142 (1979) ("general intent ... is not negated by diminished capacity")." *Veverka v. Cash*, 318 N.W.2d 447, 449 (Iowa 1982). In *State v. Gramenz*, 256 Iowa 134, 126 N.W.2d 285 (1964), the Iowa Supreme Court first recognized the diminished responsibility defense but held that it was not available as a defense to second-degree murder. The court reasoned that the concept of diminished capacity applies only to specific intent crimes:

We cannot, however, agree with defendant that the jury should have been allowed to consider the evidence of his mental condition on the elements of malice aforethought and general criminal intent. While malice aforethought is the specific state of mind necessary to convict of murder, it is far different from the specific intent which is a necessary element of murder in the first degree.

*Id.* at 142, 126 N.W.2d at 290.

In *State v. Gregory*, 327 N.W.2d 218 (Iowa 1982) *cert. denied* 464 U.S. 833, 104 S.Ct. 115, 78 L.Ed.2d 115 (1983), the court

again considered whether diminished responsibility should have a bearing on the malice aforethought element of murder. The court adhered to its stance in *Gramenz* and held that the trial court did not err in refusing to instruct on diminished responsibility. *Id.* at 220; *see also Veverka,* 318 N.W.2d at 449 (second degree murder is not a specific intent crime and therefore is not subject to the defense of diminished capacity). Most recently in *State v. McVey,* 376 N.W.2d 585, 588 (Iowa Nov. 13, 1985), the court reiterated its position holding that the diminished responsibility defense is available only to specific intent crimes.

■ In this case, Plowman correctly acknowledges that trial counsel did not take exception to the noninclusion of such an instruction and therefore failed to preserve error on this issue. However, this does not entitle Plowman to relief on her ineffective assistance claim. Defense counsel had no obligation to request an instruction which is inconsistent with the present state of the law in Iowa. "Counsel need not be a crystal gazer; it is not necessary to know what the law will become in the future to provide effective assistance of counsel.... To violate constitutional standards, defense counsel's error must be such that a reasonably competent attorney acting as a diligent and conscientious advocate would not have made." *Snethen v. State,* 308 N.W.2d 11, 16 (Iowa 1981).

We conclude that defense counsel was not ineffective in failing to request an instruction on diminished capacity with respect to the second-degree murder charge.

**Prior Bad Acts.** Three witnesses testified concerning Plowman's abuse of Lacy within the seventeen-month period of time before Lacy's death. Plowman contends that the trial court erred in admitting this testimony because the acts involved were too remote in time to the offense charged to be relevant.

■ The determination of whether evidence is relevant is largely one for the trial court and such determination is reversible only if the court abuses its discretion. *State v. Kellogg,* 263 N.W.2d 539, 542 (Iowa 1978). Thus, defendant must demonstrate on appeal that the trial court exercised its discretion for reasons "clearly untenable or to an extent clearly unreasonable." *State v. Morrison,* 323 N.W.2d 254, 256 (Iowa 1982).

■ Iowa R.Evid. 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." One well-recognized exception to the general rule limiting admissibility of prior bad acts allows the prosecution to show prior relations between the accused and the victim to show malice aforethought. *State v. Johnson,* 318 N.W.2d 417, 438 (Iowa 1982).

To prove murder, one of the elements the State had to establish was malice aforethought. Code 1975, § 690.1. Since this element constitutes a state of mind, the prosecutor in murder cases may show prior relations between the parties including incidents of quarrels and physical acts, as bearing on the defendant's quo animo. This rule is firmly established in our law. *State v. Moelchen,* 53 Iowa 310, 314, 5 N.W. 186, 189 (prior altercation at which blows were struck—"The evidence was competent, because it tended to show that the parties had not lived together agreeably"); *State v. Cole,* 63 Iowa 695, 697, 17 N.W. 183, 184 ("evidence of conduct exhibiting a bad state of feeling on the part of the defendant towards the deceased is admissible"); *State v. O'Donnell,* 176 Iowa 337, 157 N.W. 870; *State v. Flory,* 198 Iowa 75, 199 N.W. 303; *State v. Johnston,* 221 Iowa 933, 267 N.W. 698. See also, 40 Am.Jur.2d, Homicide § 274 at 540–541 (quarrels, altercations, and hostile acts); 40 C.J.S., Homicide § 241 at 1176.

*Kellogg,* 263 N.W.2d at 542. *See also State v. Tornquist,* 254 Iowa 1135, 120

N.W.2d 483, 491 (1963) (evidence of defendant's bad feelings toward deceased is admissible).

■ In the case at bar, Plowman was charged with second-degree murder. Therefore, the State had to establish malice aforethought as one element of the crime. *See* Iowa Code § 707.1, 707.3 (1983). The evidence of Plowman's acts of abuse toward Lacy are admissible as tending to show her prior relationship with her daughter. These incidents clearly bear upon Plowman's state of mind. Given Lacy's short lifespan and the fact that Plowman's abuse existed throughout the seventeen-month period prior to Lacy's death, we conclude that the trial court did not abuse its discretion in admitting the challenged testimony. The elapsed time between the crime charged and the prior bad acts did not render the evidence irrelevant for the purpose of showing Plowman's state of mind on the date of Lacy's death.

**Prosecutorial Misconduct.** Plowman next contends that the trial court erred in denying her motion for mistrial based on prosecutorial misconduct. During cross-examination of Plowman by the State, the following exchange occurred:

Q. And Bonnie Edwards works at the jail, doesn't she? A. Yes, she does.

Q. Do you know Cindy Rader? A. Yes, I do.

Q. Do you know Judy Jarvis? A. I know a Judy.

Q. Those two are matrons, aren't they? A. Yes.

Q. Didn't you tell Cindy Rader and Bonnie Edwards that your attorneys had had you not eating for the last three days so that you would break down on the stand and cry? A. That is not true.

Q. Shall I bring them in here and have them testify under oath about that? A. You can if you wish.

Q. Didn't you just tell them that yesterday? A. No, I did not. I told them I did not want my sleeping pill because I wanted to be sharp.

Q. Didn't your attorneys have you go to Lacy's grave on the day before Thanksgiving even though you didn't want to go? A. No, they did not.

Q. You are saying you didn't tell Anne Lala and a lot of other people that at the jail, that you didn't want to go? A. No, I did not. I said that I had wanted to go for some time. My attorneys did not feel it was the right thing to do at that time and they wanted to wait until they felt I was ready. When I was faced with it the night before I was told that I was going, even though I had wanted to go all along, I was not sure once I was faced with it that that was what I wanted to do, and I was afraid to back out.

Q. Wasn't the purpose so that you could break down on the stand and cry? A. No.

Q. Now, didn't you tell Judy Jarvis that after this trial is over with you are going to tell me what you really think because I can't retry you again? A. That is correct.

Q. What you really think, in other words what really happened; is that what that means? A. No, what I think of you.

Q. That you hate me? A. I did not say that.

Q. But you will after the trial is over with? A. I did not say I hated you. I called you several names.

Q. Didn't you tell Judy Jarvis that you have been telling the jury what you wanted them to hear? A. No, I did not.

Q. Didn't you say anything to that effect? A. No, I did not.

Q. Did you tell that same person that they think that you are a dummy but you are not, that you are not as dumb as they think? A. I said I would like to think I'm not as ignorant as Dr. Gersh put me out to be; and if you would like to call anybody else in here, that's fine with me.

MR. DILLARD: Fine. No further questions.

As evidenced by the cited portion of the trial transcript, defense counsel lodged no objection to the prosecutor's line of ques-

tioning. After Plowman testified, outside of the jury's presence, defense counsel moved for a mistrial on the basis of the above questioning. The trial court denied the motion.

■ It is well settled that in order to preserve for review the issue of a fair trial because of misconduct of counsel "it is the duty of the party aggrieved to timely voice an objection to give the trial court opportunity to rule on the matter since he occupied a position of vantage and his conclusion is entitled to much weight." *State v. Dahlstrom,* 224 N.W.2d 443, 449 (Iowa 1974). By her own admission, defense counsel made a tactical decision not to object to the prosecution's questions to give Plowman an opportunity to deny the allegations. Therefore, the issue was not preserved for our review.

Furthermore, when Plowman elected to testify, her credibility as a witness became important and she submitted herself to cross-examination to test that credibility. *See State v. Broten,* 176 N.W.2d 827, 829 (Iowa 1970) (a defendant who testifies subjects himself to the same rules on impeachment and credibility as an ordinary witness); *see also State v. Allnutt,* 261 Iowa 897, 909, 156 N.W.2d 266, 273 (1968) (defendant cannot escape cross-examination to test credibility).

■ A display of emotion by Plowman on the witness stand is a part of her demeanor which is subject to consideration by the jury in determining the credibility of her testimony. The prosecutor's questions during Plowman's cross-examination had a basis in fact and explored whether the emotions Plowman demonstrated before the jury were in fact contrived. Because the prosecutor's line of questioning was proper, we conclude that the trial court did not err in failing to find prosecutorial misconduct on this basis.

**Display of Autopsy Photographs.** All of the photographs of Lacy's autopsy of which Plowman now complains were admitted into evidence without objection by defense counsel. Plowman has, therefore, waived any objection to the admission of the photographs and we will not address such issue on appeal. *See State v. Johnson,* 272 N.W.2d 480, 483 (Iowa 1978). However, when the State attempted to show the photographs to the jury with an overhead projector during the examining physician's testimony, defense counsel voiced an objection to this mode of display as being unduly prejudicial. The State agreed not to use the overhead projector. Defense counsel, then, also objected to circulation of the photographs among the jury because they would have the opportunity to view them during deliberation. The court overruled this objection. In deference to the defense position, the prosecutor instead held up each photograph for the jury to observe as the doctor explained what was depicted. Plowman contends that the trial court abused its discretion in allowing the State to display the photographs to the jury.

■ It cannot be questioned that counsel may reasonably display exhibits which are in evidence. *State v. Pepples,* 250 N.W.2d 390, 396 (Iowa 1977). "Counsel may also use visual aids to illustrate matters in evidence in aid of their analysis." *Id.* Autopsy photographs are admissible to illustrate medical testimony and demonstrate viciousness in connection with the State's claims of malice. *State v. Hickman,* 337 N.W.2d 512, 516 (Iowa 1983).

■ The autopsy photographs in this case served to illustrate the medical testimony and made it comprehensible for the jury. We conclude that the State reasonably displayed these admitted exhibits and the trial court did not abuse its discretion in so allowing.

AFFIRMED.