**STATE of Iowa, Plaintiff-Appellee,**

v.

**Richard Dale WHEELER,**
**Defendant-Appellant.**

No. 85–1627.

Court of Appeals of Iowa.

Jan. 28, 1987.

James P. Piazza, of Piazza, Holmes & Beery, Des Moines, for defendant-appellant.

Thomas J. Miller, Atty. Gen., Thomas D. McGrane, Asst. Atty. Gen., and D. William Thomas, Asst. Co. Atty., for plaintiff-appellee.

Heard by OXBERGER, C.J., and SNELL and SACKETT, JJ., but decided en banc.

SACKETT, Judge.

Defendant Richard Dale Wheeler appeals from conviction of murder in the first-degree in violation of Iowa Code §§ 707.1 and 707.2 (1985) and theft in the second degree in violation of Iowa Code §§ 714.1(1) and 714.2(2) (1985). Defendant contends the trial court erred (1) in finding he was not insane at the time the crimes were committed and (2) in finding him guilty because insufficient evidence was presented to find beyond a reasonable doubt defendant possessed sufficient mental capacity to form specific intent to commit first-degree murder and second-degree theft.

On December 18, 1984, Richard Wheeler shot and beat to death his father, Dale Wheeler, in his father's Polk County home. Defendant hid the gun under his bed, kicked open the back door to make it appear as though his father had been killed by robbers and left the scene in his father's automobile. Defendant fled Iowa and was later arrested in Alabama.

Defendant was charged by trial information with first-degree murder and second-degree theft of his father's automobile. At an initial competency hearing the trial court received testimony from Shahe Zenian, a clinical psychologist with Broadlawns Medical Center, that defendant suffered from severe paranoid schizophrenia. After he was initially declared incompetent to stand trial, defendant was ordered to the Iowa Security and Medical Classification Facility at Oakdale for treatment and evaluation. Defendant was stabilized on anti-psychotic medications and was adjudged

competent to stand trial after a second competency hearing.

Defendant waived his right to a jury trial. At a bench trial the defendant presented a defense on diminished responsibility and insanity. The uncontroverted evidence of the homicide was stipulated and the trial proceeded essentially on the sole issue of insanity.

Evidence presented at trial showed defendant had not been taking medications prescribed to control his schizophrenia at the time the crimes were committed. Dr. Curtis Frederickson, a staff psychiatrist with the Department of Corrections, and Zenian both testified that at the time defendant committed the crimes he held a delusional belief his father was sexually involved with defendant's fictitious girlfriend, a person he had not seen since grade school. Zenian also testified defendant held a delusional belief his father was trying to kill him. The two experts gave conflicting testimony on whether defendant was able to form the specific intent necessary to commit the crimes. Specifically, the experts differed in their testimony about whether defendant had the capacity to determine right from wrong when he committed the crimes.

The trial court found defendant guilty of both crimes as charged. The trial court entered judgment sentencing defendant to a mandatory life sentence on the first-degree murder charge and to a five-year sentence on the second-degree theft charge. This appeal followed.

## I.

Our scope of review is on assigned error only. Iowa R.App.P. 4. The standard of review in challenging the sufficiency of the evidence is well established. *State v. Lampman*, 342 N.W.2d 77, 81 (Iowa App. 1982). We will uphold a verdict where there is substantial evidence in the record tending to support the charge. *State v. Aldape*, 307 N.W.2d 32, 39 (Iowa 1981).

When reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the state, including legitimate inferences and presumptions which may fairly and reasonably be deduced from the evidence in the record. *State v. Hall*, 371 N.W.2d 187, 188 (Iowa App.1985); *State v. Bass*, 349 N.W.2d 498, 500 (Iowa 1984). Direct and circumstantial evidence are equally probative so long as the evidence raises "a fair inference of guilt and [does] more than create speculation, suspicion, or conjecture. *State v. Hamilton*, 309 N.W.2d 471, 479 (Iowa 1981). It is necessary to consider all the evidence in the record and not just the evidence supporting the verdict to determine whether there is substantial evidence to support the charge. *Hall*, 371 N.W.2d at 188; *Bass*, 349 N.W.2d at 500. Substantial evidence means evidence which would convince a rational factfinder that the defendant is guilty beyond a reasonable doubt. *Hall*, 371 N.W.2d at 188; *State v. LeGear*, 346 N.W.2d 21, 23 (Iowa 1984).

## II.

Defendant contends the evidence presented to the trial court proved by a preponderance of the evidence defendant was insane at the time he committed the crimes for which he was convicted.

The Iowa legislature codified the *M'Naghten* rule on insanity defenses in Iowa Code § 701.4 (1985). *State v. Collins*, 305 N.W.2d 434, 436 (Iowa 1981). Section 701.4 provides in part:

A person shall not be convicted of a crime if at the time the crime is committed the person suffers from such a disease or deranged condition of the mind as to render the person incapable of knowing the nature and quality of the act the person is committing or incapable of distinguishing between right and wrong in relation to that act. Insanity need not exist for any specific length of time before or after the commission of the alleged criminal act.

Pursuant to § 701.4 a defendant must be acquitted if, as a result of a diseased or deranged mind, the defendant is:

1. Incapable of knowing the nature or quality of the act being committed; *or*
2. Incapable of distinguishing between right and wrong in relation to the act.

*See State v. Craney,* 347 N.W.2d 668, 680 (Iowa), *cert. denied* 469 U.S. 884, 105 S.Ct. 255, 83 L.Ed.2d 192 (1984). If the trier of fact finds the defendant was able to comprehend the nature and consequences of the act and knew the act was wrong, the defense of insanity falls even though the defendant may have acted from irresistible impulse. *Id.* In 1984 the Iowa legislature amended § 701.4 to impose the burden on the defendant to prove insanity by a preponderance of the evidence. Iowa Code § 701.4 (1985).

The Iowa courts have held the words "right" or "wrong' used in § 701.4 "should be understood in their legal and not in their moral sense." *State v. Hamann,* 285 N.W.2d 180, 183 (Iowa 1979). This is not to say that sanity is to be measured by legal knowledge. Rather, the determination is to be made on the basis of a person's ability to understand it when something is prohibited by law:

[T]he law is administered upon the principle that everyone must be taken conclusively to know it, without proof he does know it. If the accused was conscious that the act was one which he ought not to do, and if that act was at the same time contrary to the law of the land, he is punishable.

*Id.* at 184 (quoting *M'Naghten's Case,* 10 Clark & F. 200, 210, 8 Eng.Rep. 718, 722 (1843)).

■ Defendant contends he produced sufficient evidence through testimony of two experts that he could not distinguish right from wrong at the time he committed the crimes. Defendant argues the testimony of Zenian clearly established that the standards of § 701.4 had been met. Zenian testified that while defendant probably appreciated the quality of his actions, defendant "is responding as a sick person, as a delusional individual, and therefore cannot differentiate between right and wrong the way a person who does not have that condi-

tion would." Defendant points out Zenian's testimony was consistent with his earlier diagnosis and reports to the trial court pending the competency hearing.

Defendant further argues the trial court should have totally disregarded the testimony of his expert witness Dr. Curtis Frederickson, staff psychiatrist with the Department of Corrections. Dr. Frederickson testified defendant did know right from wrong when he killed his father even though he was acting under delusional beliefs:

I think in the final analysis that what he did was partly due to his mental illness, but I also think it was partly due to the anger and hostility or hatred that he had for his father that was present before he developed his mental illness.

Defendant contends Dr. Frederickson's testimony at trial was not credible because it differed from an earlier report to the trial court which stated defendant "to a large degree ... did not know it was right or wrong." At trial Dr. Frederickson testified that after further review of his records he had determined the conclusions he initially drew were incorrect. As a result, defendant argues the trial court erred in not disregarding Dr. Frederickson's trial testimony.

We, however, do not determine anew the weight to be given trial testimony. *Lampman,* 342 N.W.2d at 81. The credibility of witnesses and the weight to be given their testimony is a function of the trier of fact. *Id.* The trier of fact is not obliged to accept opinion evidence, even from experts, as conclusive. *State v. Nunn,* 356 N.W.2d 601, 604 (Iowa App.1984). It may be accepted in whole, in part, or not at all. *Id.; State v. Shultz,* 231 N.W.2d 585, 587 (Iowa 1975).

Viewing the evidence in the light most favorable to the state, we find there is substantial evidence to support the trial court's conclusion defendant did not prove by a preponderance of evidence he was insane when he committed the crimes. We make this determination because we find there is substantial evidence to support the

trial court's determination defendant was capable of distinguishing right from wrong at the time he committed the crimes. After defendant shot and beat his father he hid the gun and fled from Iowa. When he contacted his sister by phone, defendant refused to tell her his whereabouts. Defendant also used an assumed name when he fled the state. Defendant's evasive actions after committing the crimes is adequate circumstantial evidence supporting the trial court's determination he understood the nature of his acts and to some degree knew his actions were wrongful.

In addition, defendant's conduct and statements also acknowledge he was capable of distinguishing right from wrong. After defendant fled Iowa he told his sister in a phone conversation on the afternoon of the shooting that he knew he had killed his father and knew he was in trouble. When defendant was captured in Alabama he stated he was in the process of returning to Iowa because he knew he was in trouble and thought it would be better if he turned himself into authorities. In addition, defendant tried to escape responsibility and blame for his wrongful acts by kicking open the door to make it appear his father had been shot by burglars.

Both experts testified some of defendant's conduct was the result of delusional beliefs his father was having an affair with his fictional girlfriend. However, both experts also testified a person who suffers from delusional beliefs is not necessarily insane. They testified a person who has delusional beliefs may still understand right from wrong. In addition, Dr. Frederickson testified defendant was acting only *partly* due to delusional beliefs at the time he shot his father. Dr. Frederickson stated defendant was also acting due to his long history of anger and hatred toward his father. As such, Dr. Frederickson was suggesting defendant's actions were not totally subsumed by uncontrollable delusional beliefs. This is supported by Dr. Frederickson's earlier reports to the trial court where he stated defendant did not know right from wrong "to a large degree" but not totally.

We therefore find there is substantial evidence to affirm the trial court on the insanity issue.

### III.

Defendant next contends the state failed to prove beyond a reasonable doubt he had formed specific intent to commit the crimes of first-degree murder and second degree theft.

### A. First-Degree Murder

**1. Malice aforethought.** Section 707.1 defines murder as:

A person who kills with *malice aforethought* either express or implied ... (emphasis added)

Section 707.2 defines first-degree murder as killing with malice aforethought which has been done:

1. Willfully;
2. Deliberately; *and*
3. With premeditation. (emphasis added)

The burden is on the state to prove *each element* of first-degree murder beyond a reasonable doubt. *State v. Freie*, 335 N.W.2d 169, 172 (Iowa 1983).

Malice aforethought has been defined as "a fixed purpose or design to do some physical harm to another which exists prior to the act committed. *State v. Higginbotham*, 351 N.W.2d 513, 515 (Iowa 1984); *Nunn*, 356 N.W.2d at 603. Malice aforethought need not exist for any particular length of time and requires only such deliberation as would make a person appreciate and understand the nature of the act and its consequences. *Higginbotham*, 351 N.W.2d at 515. Malice aforethought can be implied from the use of a deadly weapon accompanied by an opportunity to deliberate. *Nunn*, 356 N.W.2d at 603. Additionally, it can be implied from prior relations between the accused and the victim. *Id.*

■ The Iowa courts have held evidence sufficient to establish defendant's lack of mental capacity to form malice aforethought is also sufficient to satisfy the requirements of the right and wrong test

of § 701.4 and entitles defendant to an acquittal on the charge of insanity rather than a reduction of the sentence. *State v. McVey*, 376 N.W.2d 585, 586–87 (Iowa 1985) (quoting *State v. Gramenz*, 256 Iowa 134, 142, 126 N.W.2d 285, 290 (Iowa 1964)). We have already determined defendant did not produce sufficient evidence to prove insanity and therefore the defense failed.

■ In the alternative, defendant argues that insufficient proof of insanity does not necessarily mean the state has met its burden to prove malice aforethought beyond a reasonable doubt. Defendant suggests that evidence concerning his mental condition showed he did not have the mental capacity to form malice aforethought and therefore the trial court erred in convicting him of murder. However, Iowa courts have held the trier of fact should not be allowed to consider evidence of a defendant's mental condition on the elements of malice aforethought and general criminal intent. *State v. Plowman*, 386 N.W.2d 546, 548 (Iowa 1986); *Gramenz*, 256 Iowa at 142, 126 N.W.2d at 290. Thus, we must disregard evidence of defendant's mental condition in determining whether the state proved malice aforethought beyond a reasonable doubt.

■ Viewing the evidence in the light most favorable to the state, we determine there is substantial evidence defendant killed his father with malice aforethought. This can be implied from defendant's use of a shotgun, his subsequent evasive actions and his prior volatile relationship with his father. Defendant's statements to his sister and the authorities also support that defendant acted with malice aforethought. After defendant fled the state he contacted his sister, telling her he knew he had killed his father and knew he was in trouble. Defendant also told authorities he knew he was in trouble and that is why he was returning to Iowa when he was captured. In addition, defendant's statements evidence he did perceive the potential lethality of the shotgun.

2. **Specific intent.** Although there is substantial evidence to support the state

proved malice aforethought beyond a reasonable doubt, that alone is not sufficient to convict defendant of first-degree murder. The state must also prove defendant acted with the specific intent required of first-degree murder. In *McVey*, the court stated that malice aforethought, the state of mind necessary to convict of murder, "is far different from the specific intent which is a necessary element of murder in the first degree." *McVey*, 376 N.W.2d at 586 (quoting *Gramenz*, 256 Iowa at 142, 126 N.W.2d at 290).

■ a. **Premeditation and deliberation.** The specific intent which the state must prove to convict defendant of first-degree murder is that defendant acted with deliberation and premeditation. To deliberate is to "weigh in one's mind or to consider, to contemplate, or to reflect." *Freie*, 335 N.W.2d at 172. To premeditate is "to think or ponder a matter before acting." *Id.* Premeditation and deliberation do not have to exist for an extended period. *State v. Craney*, 347 N.W.2d 668, 680 (Iowa 1984).

Deliberation and premeditation may be shown by circumstantial evidence through one or more of the following categories of evidence:

1. Evidence of planning activity;
2. Evidence of motive; and
3. Evidence regarding the nature or manner of killing.

*Freie*, 335 N.W.2d at 172; *State v. Taylor*, 310 N.W.2d 174, 178 (Iowa 1981); *State v. Harrington*, 284 N.W.2d 244, 247–48 (Iowa 1979).

b. **Diminished capacity.** In Iowa, proof of diminished capacity, the diminished responsibility defense, is admissible on the issue of defendant's ability to form specific intent, where such intent is an element of the crime charged. *Plowman*, 386 N.W.2d at 548; *State v. Gaddy*, 310 N.W.2d 530, 531 (Iowa App.1981). Specifically, Iowa courts have permitted evidence of a defendant's mental unsoundness to negate premeditation and deliberation on a

charge of first-degree murder. *McVey,* 376 N.W.2d at 586.

Defendant argues the trial court erred in convicting him of first-degree murder because there is not sufficient evidence to support the conviction. Defendant contends he produced substantial evidence his diminished mental capacity rendered him unable to formulate the specific intent necessary for first-degree murder. Defendant contends there was substantial expert testimony he was suffering from extreme psychosis at the time in question and his acts were the result of delusional beliefs his father was sexually involved with a female, apparently a girl defendant knew several years earlier in high school. Defendant further contends there was substantial evidence his acts were the result of delusional beliefs his father was trying to poison him.

■ Defendant argues Dr. Zenian's testimony supports defendant's contention that he was unable to form the specific intent of first-degree murder. Dr. Zenian testified defendant was suffering from severe psychotic-paranoid schizophrenia characterized by hallucinations. Dr. Zenian felt defendant, at the time he killed his father, was going through a psychotic storm and could not resist the impulse arising from his delusions. However, this is not the decisive test under the law. *See Plowman,* 386 N.W.2d at 548; *State v. Craney,* 347 N.W.2d 668 (Iowa), *cert. denied,* 469 U.S. 884, 105 S.C. 255, 83 L.Ed.2d 192 (1984). In addition, Dr. Zenian never testified defendant, given his then mental state, was incapable of acting deliberately and with premeditation. Moreover, Dr. Zenian also testified not all schizophrenics are legally insane nor does presence of a delusion necessarily mean insanity. Further, Dr. Zenian testified there was less basis for a defense of diminished capacity than the defense of insanity.

■ We also determine, as did the trial court, that Dr. Frederickson's testimony supports defendant's conviction for first-degree murder. Dr. Frederickson testified the victim's killing was partly the result of defendant's delusional beliefs, but also the killing was a result of defendant's hatred and anger for his father. Defendant argues Dr. Frederickson's testimony should have been disregarded. Defendant contends at trial Dr. Frederickson recanted and reversed an earlier opinion regarding defendant's sanity which he had reached in a report to the trial court. However, we find Dr. Frederickson never opined in pretrial documents that defendant was actually insane or incapable of acting deliberately or with premeditation. As such, we find Dr. Frederickson's testimony supports defendant's conviction.

Viewing the evidence in the light most favorable to the state, we determine the state produced sufficient evidence to prove beyond a reasonable doubt defendant killed his father deliberately and with premeditation. Wheeler admitted he arose early the morning in question and spent several hours contemplating killing his father. Wheeler waited for his mother to leave for work and then he shot his father at close range in the abdomen with a .20 gauge shotgun. Wheeler's father crawled to a nearby bathroom where Wheeler then proceeded to beat his father repeatedly over the head with the stock of the shotgun until he broke the shotgun. We agree with the determination of the trial court that premeditation and deliberation can be inferred from the manner and nature in which Wheeler killed his father.

We therefore affirm the trial court on this issue.

### B. Second-degree Theft.

Defendant argues the trial court should have acquitted him because the state failed to prove beyond a reasonable doubt defendant possessed sufficient mental capacity to form *specific* intent to commit second-degree theft. Defendant's argument is without merit.

■ The Iowa courts have held second-degree theft is a general intent crime because it is complete without intent to do a further act or achieve a further consequence. *Eggman v. Scurr,* 311 N.W.2d 77,

79 (Iowa 1979). General criminal intent exists when the prohibited result may reasonably be expected to flow from the voluntary act itself "irrespective of any subjective desire to have accomplished such result." *State v. Redmon*, 244 N.W.2d 792, 797 (Iowa 1976). As we previously stated evidence of diminished mental capacity is not a defense available to crimes which require only general criminal intent. *Plowman*, 386 N.W.2d at 548; *McVey*, 376 N.W.2d at 586. Thus, in a trial for second-degree theft sanity is presumed and the state was not required to prove any intent beyond the voluntary act of exercising prohibited control over property the accused knows does not belong to him. *McVey*, 376 N.W.2d at 586. We determine there is substantial evidence to support the trial court's determination the state had proved second-degree theft beyond a reasonable doubt.

The conviction for second-degree theft is therefore affirmed.

AFFIRMED.

All Judges concur except SCHLEGEL, J., who dissents.

SCHLEGEL, Judge (dissenting).

### I.

I certainly do not think that we should substitute a trial by experts for a trial by the legal fact finders—either court or jury. It is exclusively within the province of the trier of fact to determine the legal sanity of a defendant. *State v. Craney*, 347 N.W.2d 668, 680 (Iowa), *cert. denied* 469 U.S. 884, 105 S.Ct. 255, 83 L.Ed.2d 192 (1984). However, I also do not think that when expert testimony establishes by a preponderance of the evidence that a defendant did not know right from wrong and the other available evidence establishes by a preponderance of the evidence that the defendant did not know right from wrong that we should uphold a trial court's decision that the defendant did know right from wrong.

An expert psychologist, Dr. Zenian, testified, "My opinion is that the defendant was incapable of differentiating between right and wrong." There was no doubt whatsoever in this expert's opinion that the defendant was incapable of distinguishing right from wrong. Prior to trial another expert, Dr. Frederickson, testified, "... to a large degree, he [the defendant] did not understand or know what he was doing; did not know it was right or wrong and was incapable of forming intent." Dr. Frederickson testified at trial that he had changed his mind, that he was confused, and that he didn't know what he thought. I reproduce part of this expert's remarkable testimony to illustrate his confusion:

Q. Isn't it true that you were able to form a diagnostic impression regarding Mr. Wheeler's psychiatric status as of December 18, 1984?

A. Yes.

Q. Isn't it true, Doctor, that as a result of your evaluation of the defendant, and based upon your education and experience, you were able to come to the diagnostic conclusion that the defendant was incapable of forming specific intent on December 18, 1984?

A. I am not sure.

Q. Do you understand the question? Would it help to have the question read back to you?

A. I think I understand the question but—

Q. Well, let me rephrase the question, Doctor. Isn't it true that in your letter to Judge Lavorato of May 28, 1985, you stated the following: "In summary, I think to a large degree he did not understand or know what he," meaning Mr. Wheeler, "did not understand or know what he was doing did not know it was right or wrong, and was incapable of forming intent?" Is that what you wrote in your letter to Judge Lavorato?

A. Yes.

Q. Is that correct?

A. Is that correct what I wrote at that time?

Q. Yes, sir.

A. Yes.

Q. Have you evaluated the defendant since that date?

A. No.

Q. So you did write to Judge Lavorato that Mr. Wheeler was incapable of forming intent, isn't that true?

A. To a large degree.

Q. Is it also true to a large degree that it is your opinion that on December 18, 1984, Mr. Wheeler did not understand or know what he was doing?

A. Yes, that was my opinion in my court letter.

Q. Isn't it also true that it was your opinion in your letter to Judge Lavorato that on December 18, 1984, to a large degree Mr. Wheeler did not know if his actions were right or wrong?

A. Yes.

Q. Now, you have indicated that your diagnostic impression was that Mr. Wheeler's primary problem was that he suffered from schizophrenia, paranoid type, subchronic chronic?

A. Yes.

Q. Is it also true that your diagnostic impression was that he suffered from delusional beliefs on December 1, 1984?

A. Yes.

Q. Isn't it also your diagnostic impression that said delusional beliefs were the precipitating cause of the shooting that occurred at the Wheeler home on December 18, 1984?

A. I thought they played a role, yes.

Q. Well, isn't it true that your opinion that you expressed on May 28 that Mr. Wheeler to a large degree did not understand or know what he was doing, did not know it was right or wrong and was incapable of forming intent, those opinions were based upon your examination and your concept that he suffered from delusional beliefs?

A. Yes.

Q. Are you familiar with what is commonly known as the McNaughton Rule?

A. Yes.

Q. And you understand that that rule essentially says a person is insane if he is unable to form specific intent to understand the nature and quality of his acts or be able to distinguish right from wrong in relationship to those acts.

MR. THOMAS: Your Honor, I am going to object to that question.

MR. PIAZZA: Withdraw the question.

Q. Has your opinion changed since May 28th?

A. Yes, to some extent.

Q. Well, you have not evaluated the defendant since May 28th, have you?

A. No, but I reviewed his records and have done a lot of thinking since then.

Q. So you are saying to the Court that your letter of May 28th was incorrect?

A. I think partly, yes.

Q. What part is incorrect, Doctor?

A. I currently think that he was capable of understanding and knowing what he was doing.

Q. Okay. Let's stop there. In your letter you indicate that to a large degree he did not understand or know what he was doing. Now, what specifically has changed your opinion from May 28th to today in that regard?

A. Basically just reviewing and doing a lot of thinking on the case.

Q. Well, you can point to any set criteria or any set factor which the Court can base its opinion on as to what changed your mind from May 28th to today with regard to whether or not he could understand or know what he was doing besides just thinking about it?

A. Even though he had delusional beliefs, after reviewing the case further I decided that that did not necessarily mean that he had to act on those delusional beliefs or that he wasn't capable of knowing what he was doing or capable of knowing right from wrong.

Q. So are you saying today that you believe that he knew right from wrong on December 18th, 1984?

A. Yes, I think he knew what he was doing.

Q. Did he understand the nature or quality of his acts on December 18, 1984?

A. Yes.

Q. And you are saying today that he could tell right from wrong in relationship to those acts?

A. I think so.

Q. You think so. Do you know it one way or the other?

A. Well, I think he understood and knew that he was attempting to kill his father.

Q. Now, with regard to intent, has your opinion as Mr. Wheeler's capability of forming intent also changed since May 28th?

A. Intent is a little more confusing to me. It seems to me that the basic issue kind of boils down to whether or not he was capable of controlling his behavior at that time.

Q. What is your opinion?

A. I am not sure.

Q. You are not sure as to whether or not he could control his behavior on December 18, 1984?

A. Yes.

Q. You are not sure?

A. Yes.

Q. Does that mean yes, you are sure, or yes, you are not sure?

A. Yes, I am not sure.

Q. Now, can I presume that you informed the Court that your opinions have changed since May 28th? I mean, did you write Judge Lavorato another letter?

A. No, I didn't.

Q. When did you change your opinions as to whether you could understand or know what he was doing, whether or not he knew it was right or wrong?

A. Basically over the past four or five days as I have been reviewing the case.

Q. But it is your considered opinion, Doctor, that you don't know whether Mr. Wheeler could control his actions on the day of December 18, 1984, do you?

A. I'm not sure, yes.

Q. Let's get back to this intent. Do you today have an opinion as to whether or not Mr. Wheeler could form specific intent to kill?

A. I'm not sure what you mean by specific intent.

Q. Okay. What did you mean on May 28th when you wrote that he was incapable of forming intent? What did you mean by that?

A. I guess I mean that—I'm not sure exactly what I meant.

Q. I didn't hear that last answer.

A. I'm not sure exactly what I meant.

\*　　\*　　\*　　\*　　\*　　\*

Q. In your letter of May 28th you also indicated the following: "Some psychiatrists would probably see this as total or full insanity." Do you recall writing that?

A. Yes.

Q. Isn't that still true?

A. I think so.

Q. So it would be your testimony that from your knowledge of the professional medical community some psychiatrists would view Mr. Wheeler's condition on December 18, 1984, as total or complete insanity?

A. Yes.

Therefore, without reinterviewing the patient, this expert testified, at the most, that he was unsure. The majority, in affirming the trial court, places a heavy emphasis on Dr. Frederickson's confused testimony. It quotes from Dr. Frederickson's "final analysis;" it compares Dr. Frederickson's early and later reports; it relies on Dr. Frederickson's opinion on the defendant's delusional beliefs. The trial court, in fact, concluded "the doctor [Frederickson] is uncertain as to a conclusion on the insanity issue."

Aside from this testimony, the court looked to "the facts of the shooting itself, the act of fleeing the scene in [the defendant's] father's car, the immediate and subsequent evasive actions, the contents of the phone conversation with [the defendant's] sister on the afternoon of the shooting," in finding that the defendant knew that his action was legally wrongful. I do not think circumstantial evidence relating to defendant's actions after the crimes took place should be accorded as much weight as here assigned by the trial court. Iowa Code section 701.4 (1985) provides, in part, that "a person shall not be convicted of a crime if *at the time* the crime is committed the person suffers from a diseased or deranged condition of the mind.... Insanity *need not exist for any specific time* before or after the alleged criminal act [emphasis added]." The only credible testimony given during trial to explain this later behavior was by the psychologist Zenian when he testified:

Q. Does the fact that subsequent to December 18th Mr. Wheeler placed the firearm in question or parts of the firearm in question underneath his bed have any bearing upon your opinion?

A. No, not substantially.

Q. Would the fact that Mr. Wheeler left the jurisdiction in an automobile and was ultimately apprehended in Bay Minnette, Alabama, have any bearing on your opinion?

A. No.

Q. Would the fact that Mr. Wheeler is currently cognizant of the legal ramifications of these proceedings and the alternatives which would be available if he were acquitted have any significant bearing upon your opinion and assessment of his psychiatric condition on December 18th?

A. No, it would have nothing to do with the way he was functioning on December 18th.

Q. Would it be true that during the course of your work as a clinical psychologist for Broadlawns Medical Center you have in fact met various defendants who are masking or making up the symptoms in order to fool the psychiatrist; does that occur?

A. Yes. We run across some defendants like that every now and then.

Q. Are you able to recognize that when it occurs?

A. I have to say that I have been wrong on a few occasions, but by and large this is a commonly anticipated maneuver or strategy by someone who is in rather dire straits and consequently we tend to make a special effort to evaluate that condition.

Q. Do you see that situation as a possibility in this case, Mr. Zenian?

A. Not hardly, no. I don't think that Mr. Wheeler is feigning any symptoms or putting on any kind of an act to avoid the consequences of his acts at the time, back in December '84.

If the court was basing its conclusion on Mr. Wheeler's sanity primarily on acts that took place after the events in question, I do not see much of a consideration, for instance, of Mr. Wheeler's unstable acts while in prison:

Q. [to Mr. Zenian] Are you familiar with any erratic behavior that Mr. Wheeler has exhibited while incarcerated in the Polk County Jail?

A. Oh, yes. He has had several bouts of pretty unusual behavior.

Q. Would you describe some of those for the Court? Excuse me, strike that. First of all, has any of the behavior that he has exhibited while incarcerated been consistent with your diagnosis.

A. Yes, they could be components of a schizophrenic reaction.

Q. Could you describe for us any specific behavior that you are aware of that would in fact be consistent with your diagnosis?

A. Well, very generally, when we first had an opportunity to examine Mr. Wheeler during the early part of—correction, mid part of January '84 and since then, he certainly had a very distraught appearance about him. He was very tense, would talk a mile a minute, would

get on one particular topic and could not let go. He was very obsessed by a number of different thoughts. He had a great push of speech. On one occasion he—I think to dramatize some of this, it was felt necessary to put him in a solitary isolation even with medication. I believe at the time he was in such a frenzy of behavior he had to be put in restraints, I think what would commonly be referred to as a straight jacket; and he even, while he was in solitary, in a room which had absolutely nothing in it, a rubber room, a padded cell, managed to bash his head on a grating which is indented below the surface of the floor. You would have to make an extreme effort to injure yourself in a room like that, but managed to smash his forehead into that grating with considerable force. I think leaving some scars to this day. And a lot of other behaviors with regard to eating certain things and not others and, as I said, having to be placed in restraints and so on. These are all quite common characteristics of a schizophrenic person.

I do not think there is sufficient evidence to support the trial court's conclusion that the defendant did not prove by a preponderance of the evidence that he was insane when he committed the killing.

## II.

Even if the trial court did not find that the defendant had carried his burden in showing that he was incapable of distinguishing right from wrong at the time of the killing, it should have recognized that the State did not sustain its burden of proving that the defendant committed the crime of murder in the first degree. In a prosecution for first degree murder, the State is required to show beyond a reasonable doubt that the defendant killed with malice aforethought and in a willful, deliberate, and premeditated manner. Iowa Code § 707.2 (1985); *State v. Blair*, 347 N.W.2d 416, 419 (Iowa 1984). I do not believe the State carried its burden with respect to the elements of premeditation and deliberation.

In Iowa, proof of the diminished mental capacity of a defendant has been accepted to negate the elements of premeditation and deliberation. *State v. Gramenz*, 256 Iowa 134, 140, 126 N.W.2d 285, 290 (1964). Evidence of diminished responsibility is admissible as a defense in any crime which requires proof of specific intent as an element. *State v. Barney*, 244 N.W.2d 316, 318 (Iowa 1976).

The elements of premeditation and deliberation, in this case, were effectively negated by evidence of diminished capacity on the part of the defendant. Deliberation and premeditation may be shown by circumstantial evidence in one or more of the following ways: 1) evidence of planning activity of the defendant which was directed toward the killing; 2) evidence of motive which might be inferred from entire relationship between defendant and victim; and 3) evidence regarding the nature of the killing. *State v. Freie*, 335 N.W.2d 169, 172 (Iowa 1983); *State v. Wilkens*, 346 N.W.2d 16, 20 (Iowa 1984). Requisite premeditation and deliberation may be negated by evidence that the defendant, because of mental illness not amounting to insanity could not plan a killing in a way possible by our first degree murder statute. *State v. Gramenz*, 126 N.W.2d at 290.

In this case, the defendant may have had time to think on the matter before acting, and he may have willfully carried out the act. Surely, however, if we say the defendant knew the difference between right and wrong, it is not possible to say that the planning, the motive, or the manner of the killing are not sufficiently suffused with mental disturbance to negative the requirement that he killed "deliberately." The uncontroverted testimony established that the defendant was acting under the belief that his father was sexually involved with a grade school acquaintance of the defendant. The gun was "hidden" only to the extent of placing it uncovered under a bed. The evidence did not reveal a "lying in wait" murder but rather a killing with such motive, planning and manner of carrying out that revealed a seriously ill mind. In

*People v. Wolff,* 61 Cal.2d 795, 40 Cal.Rptr. 271, 288, 394 P.2d 959, 976 (1964), the court held that when a defendant did not have the mental capacity to "maturely and meaningfully reflect" upon the gravity of what he was going to do, this factor should be taken into account when deciding whether the murder should be classed as first degree murder. If we are not inclined to overturn the court's conclusion that the preponderance of the evidence failed to establish insanity, I think we must find upon the facts and the law, that the evidence also failed to support the finding, in the circumstances of the defendant's undisputed mental illness, that the murder was of the first degree. Rather, at the most, the evidence can only sustain a conviction of second degree murder.