# IN THE COURT OF APPEALS OF IOWA

No. 21-0080
Filed July 20, 2022

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**ELIOT JAMES STOWE,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Monona County, Zachary Hindman,

Judge.

        Eliot Stowe appeals his conviction for first-degree murder.  **AFFIRMED.**

        Martha J. Lucey, State Appellate Defender, and Vidhya K. Reddy, Assistant

Appellate Defender, for appellant.

        Thomas J. Miller, Attorney General, and Sheryl Soich, Assistant Attorney

General, for appellee.

        Heard by Vaitheswaran, P.J., Badding, J., and Vogel, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206

(2022).

**VAITHESWARAN, Presiding Judge.**

Eliot Stowe appeals his first-degree murder conviction. He argues the district court should have found him not guilty by reason of insanity.

## I.     Background Facts and Proceedings

Cheryl, described by her friend as "a real champion of the underdog," took in her adult grandson, Eliot Stowe. When Cheryl uncharacteristically failed to show up for a work meeting, a Monona County sergeant went to her acreage to check on her.

Stowe answered the door. The sergeant, who had since learned there was an outstanding warrant on Stowe, arrested him and entered the home "to check on Cheryl's possible well-being." In a bedroom, he observed "a large mass of dried blood" on the floor and "more blood underneath the bed." A search warrant was later executed on the home.

Cheryl's body, wrapped in what appeared to be a large living room rug secured with duct tape, was found in a field about a mile and a half from her home. A roll of duct tape was picked up in the middle of a road. A burned baseball bat was found in a fire pit outside Cheryl's garage. The deputy medical examiner testified that Cheryl sustained "blunt force injuries" caused by an object "like a bat."

The State charged Stowe with first-degree murder. Stowe notified the district court of his intent to rely on an insanity defense. Following a bench trial, the court rejected the defense and found Stowe guilty.

## II.     Insanity Defense

The statutory insanity defense states:

> A person shall not be convicted of a crime if at the time the crime is committed the person suffers from such a diseased or deranged condition of the mind as to render the person incapable of knowing the nature and quality of the act the person is committing or incapable of distinguishing between right and wrong in relation to that act. Insanity need not exist for any specific length of time before or after the commission of the alleged criminal act. If the defense of insanity is raised, the defendant must prove by a preponderance of the evidence that the defendant at the time of the crime suffered from such a deranged condition of the mind as to render the defendant incapable of knowing the nature and quality of the act the defendant was committing or was incapable of distinguishing between right and wrong in relation to the act.

Iowa Code § 701.4 (2018).

Stowe concedes that "the question is whether 'there is substantial evidence to support the trial court's conclusion the defendant did not prove by a preponderance of evidence he was insane when he committed the crimes.'" (Quoting *State v. Wheeler*, 403 N.W.2d 58, 61 (Iowa Ct. App. 1987), *overruled on other grounds by State v. Reeves*, 636 N.W.2d 22, 25 (Iowa 2001).) Stowe also concedes "credibility issues are left to the factfinder" and "a factfinder generally is not obliged to accept expert testimony, even if it is uncontradicted." (Internal citations and quotations omitted.) But he asserts "expert testimony 'should not be arbitrarily and capriciously rejected.'" (Citing *Waddell v. Peet's Feeds, Inc.*, 266 N.W.2d 29, 32 (Iowa 1978).) In his view, the district court "discarded" two expert opinions "in favor of its own observations and analysis—failing to account for the reality that inferences which can routinely and logically be drawn from a mind unafflicted by schizophrenia, will not necessarily apply to a mind that *is* so afflicted."

Three experts testified on the insanity defense. Clinical psychologist Richard Frederick opined Stowe appeared "to be somebody who had

schizophrenia," he was "treated for it," and he "was doing pretty well." At the same time, he discerned "some confusion in [Stowe's] thinking at some level," and he characterized the "disorganization of thinking" as a hallmark of schizophrenia. After several hours of conversation with Stowe, Dr. Frederick opined Stowe "clearly" did not "understand what [was] happening," he was "in a state of unreality" when he killed his grandmother, and he "did not know" that the charged behavior "was wrong."

Forensic psychologist Tracy Thomas, who was retained by the State to evaluate Dr. Frederick's opinion, ultimately opined that Stowe "did know [the] nature and quality" of his behavior but he "had a diseased or deranged condition of the mind" that "caused him to be unable to distinguish between right and wrong." She, too, interviewed Stowe and, like Dr. Frederick, she relied in part on Stowe's "disorganization of thought," which she defined as "illogical, garbled, nonsensical" thinking.

Psychiatrist James Dennert testified for the State. Following a document review, he saw "no evidence that Mr. Stowe was suffering any sort of acute psychiatric or psychotic condition." He did reason that Stowe may have personality disorder and was possibly suffering from schizophrenia, but he opined Stowe "did not suffer a mental impairment, illness, or derangement at the time of the event that would prevent him from being able to understand the nature and consequences of his actions, nor prevent him from being able to understand the difference between right and wrong."

The district court thoroughly evaluated each of the three expert opinions. The court found Dr. Dennert "credibly" focused on Stowe's "mental state from

closest in time to when he killed Cheryl." In contrast, the court noted that Drs. Frederick and Thomas relied on Stowe's after-the-fact, self-serving statements. The court contrasted those statements with Stowe's rational behaviors around the time of the killing, citing the following pieces of evidence among others:

- The "manner" in which Stowe killed Cheryl: "he inquired of Cheryl what would happen if he hit her with a baseball bat; he listened to her answer, that she would probably die; he went and retrieved a baseball bat; he followed her to the bedroom where she went to try to get away from him; he attempted unsuccessfully to open the bedroom door; he broke out a panel of the bedroom door; he reached through the panel and hit her with the baseball bat; he opened the door and hit her more; and then once Cheryl had crawled under the bed, he sat, smoked a cigarette, and waited for her to die."

- Stowe's "efforts at hiding the evidence" of Cheryl's killing: he "rolled her or her body up in two rugs; thoroughly secured the rugs with duct tape; obtained the keys required to access one of Cheryl's vehicles; placed butcher paper in the back of the vehicle in order to soak up any of Cheryl's blood that may have leaked from her body; carried her body from her residence to the vehicle, and placed it inside the vehicle; searched for a place to dump Cheryl's body; decided to dump her body off of a low-maintenance Level B access road, . . . rather than a main road; then decided to dump her body such that a fence and some trees or bushes were between the road and where he left her body; dumped the roll of duct tape that he had used to secure Cheryl's body in the rugs in a different direction, from her house, than where he had dumped her body; then returned to Cheryl's residence and wiped up his bloody footprints from the floor of the house; turned on a fan in the bedroom where most of the bloodstains were, and pointed the fan at the bloodstains; poured some kind of cleaning powder on the biggest bloodstains; shut the partially broke door between the bedroom where most of the evidence of Cheryl's death was, and the rest of the house; and attempted to burn up the bat which he had used to beat Cheryl."

- Stowe's interaction with the officers during the welfare check: Stowe told the officer "why Cheryl was not at her house": "[Stowe's] story was carefully crafted to try to address some of the most suspicious aspects of Cheryl's absence. In

particular, by claiming that Cheryl had been picked up by a friend, [he] explained why all of [her] vehicles remained at her house. And by claiming that Cheryl had flown somewhere 'down there' to help a Latino individual who had been deported, he implied that she had gone somewhere in Latin America, which could provide a possible explanation for why she was unreachable by phone. [His] story also anticipated, and attempted to address, less significant potentially suspicious aspects of the situation—for example, when [he] was pressed by [the officer] for more details, he told [the officer] that he was not 'super overly in [her] business,' as an explanation for why he could not do so."

- Stowe's response to the officer's refusal to close and lock the door of Cheryl's home: "[Stowe] demanded that [the officer] shut the door in front of [Stowe], so that [Stowe] could see him do it. [Stowe] told [the officer] that he knew his legal rights, and asserted a property interest in the house. And [Stowe] asserted that if [the officer] or another officer 'cross[ed] the premises of the threshold' of the door to Cheryl's house, [the officer] or that other officer would be 'breaking and entering'- which is a fairly accurate recitation of the law."

- Stowe's interactions with the officers during execution of the search warrant: "he posed to the officers who were present intelligent inquiries about the search warrant; he sought clarification about whether the search warrant was distinct from and in addition to the warrants for his arrest; he inquired who issued the search warrant; and he inquired what the officers meant when they said that the search warrant made his refusal to consent to the search irrelevant."

- Stowe's interactions with officers after execution of the search warrant: "he asked reasonable and intelligent questions about his bond situation; he inquired whether the charges on which he had been arrested were felonies or misdemeanors; he cooperated with the completion of paperwork relating to his placement in jail; and he responded rationally to questions asked of him during this procedure."

The court determined Stowe—"very soon after he killed Cheryl"—

was able to rationally assess his situation; he was able to rationally anticipate the likely future actions of others, in response to that situation; and he was able to rationally devise and then mostly carry out a plan designed to minimize the chances that those others would act in ways detrimental to him.

These calculations, the court said, undermined Stowe's statements and the two experts' reliance on his seemingly disorganized thought processes. The court expressed a lack of conviction that "at the time when [Stowe] killed Cheryl, his mental illness rendered him incapable of knowing the nature and quality of that act" or "that . . . his mental illness rendered him incapable of distinguishing between right and wrong in relation to that act."

Substantial evidence supports the district court's findings underlying its conclusion on the insanity defense. As for the court's evaluation of the expert testimony, it is established that "[w]hen conflicting psychiatric testimony is presented to the fact finder, the issue of sanity is clearly for the fact finder to decide." *See State v. Jacobs*, 607 N.W.2d 679, 685 (Iowa 2000). Indeed, as noted at the outset, "[t]he trial court as trier of fact is not obligated to accept opinion evidence, even from experts, as conclusive." *Id.* And "[w]hen a case evolves into a battle of experts, we, as the reviewing court, readily defer to the district court's judgment as it is in a better position to weigh the credibility of the witnesses." *Id.* Because it was the district court's prerogative to weigh the three expert opinions, we affirm the court's findings and determinations with respect to those experts, the court's conclusion on the insanity defense, and Stowe's judgment and sentence for first-degree murder.

**AFFIRMED.**