# IN THE COURT OF APPEALS OF IOWA

No. 23-0454
Filed June 5, 2024

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**PRESTON ODELL MARTIN,**
        Defendant-Appellant.
_____

Appeal from the Iowa District Court for Wapello County, Gregory Milani,

Judge.

A defendant appeals the district court's rejection of his insanity defense.

**AFFIRMED.**

Martha J. Lucey, State Appellate Defender, and Shellie L. Knipfer, Assistant

Appellate Defender, for appellant.

Brenna Bird, Attorney General, and Joseph D. Ferrentino, Assistant

Attorney General, for appellee.

Heard by Tabor, P.J., and Greer and Schumacher, JJ.

**TABOR, Presiding Judge.**

The district court found Preston Martin guilty of murder, burglary, and robbery, each in the first degree. He appeals, arguing the district court should have found by a preponderance of the evidence that he was insane at the time of the offenses. We find substantial evidence supporting the court's decision that Martin failed to prove his insanity defense, so we affirm the court's verdicts.

### I. Facts and Prior Proceedings

One morning in late May 2019, Tommy Foster called Ottumwa police to report a suspicious person who approached his house. In the call just before noon, Foster described the person but did not ask for officers to respond. Earlier that day, neighbors saw Martin walking near Foster's house wearing a dark shirt and dark jeans. Meanwhile, Foster's father came to his son's house to mow the lawn. He knocked on his son's door and received no answer. Around 2:45 that afternoon, he returned to his son's house and found a side door ajar. After entering, he found his son's body on the floor. Tommy had been stabbed to death. The father called his wife, who called 911.

Responding to that call, police found blood spatter all over the kitchen. A bloody butcher knife was in the sink, partially hidden under a colander. Foster's body was on the kitchen floor, surrounded by towels, clothing, and blankets, soaking up the blood. There was no sign of forced entry into the house. A plastic food storage container where Foster kept his loose change was missing, along with his car keys. But other valuables, such as a video game system, were left behind.

Foster's washing machine supplied clues to the investigators. It was filled with water, but not running. Inside was a dark green shirt and a pair of dark jeans, later identified as belonging to Martin. And Martin's fingerprints were on the lid.

A few blocks from Foster's house, surveillance cameras captured a shirtless Martin entering a convenience store around 2:00 p.m. and buying a drink. About half an hour later, Martin entered another convenience store, where he hung around for about fifteen minutes. Video from the second store showed Martin holding the container of change from Foster's house.

Around 2:50 p.m., while police were at the crime scene, they spotted Martin walking by the house. He matched the description Foster gave earlier. As he drew near the house, he crossed the road and then turned in the other direction. Martin was still shirtless. Police intercepted Martin as he was walking across the Jefferson Street bridge and asked why he was not wearing a shirt. Martin said he gave his shirt to a friend. The officers noticed that Martin's boots were speckled with blood—later determined to match Foster's DNA. The officers recalled that some of their conversation with Martin did not make sense, especially his repeated mention of the odd phrase: "ink dot." The officers arrested Martin and took him to the police station for questioning. At the time of his arrest, Martin was wearing Foster's jeans. And in his pocket, Martin had Foster's car keys.

During his police interrogation, Martin made no admissions. But in the officers' estimation, he did make "a lot of very random" and "weird" statements. For example, he discussed "voodoo, Wiccan, and Freemasons." He also claimed to have put a "hex" on one officer.

At trial, an interviewing officer testified that when they pressed him about the murder, Martin "redirected the conversation." The officers showed Martin a photo of Foster's house and "essentially accused him of murdering the victim," but Martin "wanted to have no part in that conversation." Martin would discuss other events in the day, such as stopping by the convenience store and talking with a friend, but "nothing about the murder itself." He continued to reference "ink dot" and raised other issues not relevant to the murder. During the investigation, officers learned Martin had been diagnosed with schizophrenia and had been committed multiple times. He was on disability insurance for his mental-health impairments.

The State charged Martin with first-degree murder in May 2019. It added charges of first-degree burglary and first-degree robbery in July. Trial was delayed in September 2019, January 2020, and July 2021 when the court found Martin incompetent and suspended proceedings. The court decided Martin's competency was restored in December 2021 and resumed proceedings. The defense waived a jury trial and notified the State of Martin's intent to raise diminished capacity and insanity defenses.

At the bench trial, psychologist Luis Rosell testified for the defense, giving his expert opinion that Martin was psychotic on the day of the murder. The State offered rebuttal testimony from psychologist Rosanna Jones-Thurman. She concluded that Martin was not psychotic and demonstrated malingering. After trial, the court found sufficient evidence that Martin committed the three offenses, rejecting his diminished capacity defense, and determined he did not prove his affirmative defense of insanity. Martin appeals.

## II. Scope and Standards of Review

We review challenges to the sufficiency of evidence following a bench trial for correction of legal errors. *State v. Brimmer*, 983 N.W.2d 247, 256 (Iowa 2022). We affirm if the court's verdicts are supported by substantial evidence. *State v. Myers*, 924 N.W.2d 823, 826 (Iowa 2019). We review all the evidence in the light most favorable to the district court's decision. *Id.* at 826–27.

On the affirmative defense, it was Martin's burden to prove by a preponderance of the evidence that he was insane at the time of the offense. *See* Iowa Code § 701.4 (2019); *State v. Buck*, 510 N.W.2d 850, 852 (Iowa 1994).

## III. Analysis

Martin's sole argument on appeal is that he proved his insanity defense.[1] That defense is defined in Iowa Code section 701.4. The statute precludes conviction if at the time of the crime the accused was suffering from "a diseased or deranged condition of the mind" that rendered them "incapable of knowing the nature and quality of the act" "or "incapable of distinguishing between right and wrong in relation to that act." "Insanity need not exist for any specific length of time" before or after the crime. Iowa Code § 701.4.

---

[1] As its first matter of business, the district court found the State presented sufficient evidence to prove beyond a reasonable doubt that Martin committed all three offenses, including the intent elements—overcoming Martin's diminished responsibility defense. Martin claimed that he was compelled to kill Foster and could not stop himself. The court disagreed and found that Martin's admission to Rosell that "he was cognizant of his action even if experiencing some sort of mental health condition" meant he "had the capability and capacity" to form the required intent. The court also pointed to Martin grabbing the knife and taking the car keys as proof of the intent elements of robbery and burglary. Martin does not contest the court's diminished-responsibility findings on appeal.

As both sides agree on appeal, an insanity defense often comes down to a "battle of the experts" wherein the fact finder can rely on the expert it finds the most credible. *See, e.g.*, *State v. Wadsworth*, No. 16-1775, 2018 WL 2230666, at *8 (Iowa Ct. App. May 16, 2018). If the experts "conduct substantially equivalent reviews of the case, it is 'within a district court's province to choose one expert's opinion over a competing qualified expert's opinion.'" *Id.* (quoting *United States v. Ghane*, 593 F.3d 775, 781 (8th Cir. 2010)). Although that is not exactly what the district court did here, we begin our analysis with the conflicting opinions of the experts.

First, Dr. Luis Rosell testified for the defense, and the court admitted his report. Rosell examined police records, audio of Martin's interrogation, pretrial competency evaluations by state psychiatrists, the minutes of evidence, and defense motions for competency hearings. He also interviewed Martin. He detailed Martin's history of substance use, two commitments to mental-health facilities, and history of criminal charges and imprisonment. Martin was committed in 2015 and again in 2016 based on his wife's concern about his behavior. In 2017, his outpatient mental-health provider noted he was experiencing "self-care deficits" and looked "disheveled" while demonstrating "bizarre delusions, auditory hallucinations, and paranoia."

Martin told Rosell that on the day of the offenses, he was smoking methamphetamine and his "body decided to go one way and it would not stop moving." He recalled:

> I was sitting there, and it happened again, my body went to the opposite direction I wanted to go. I wanted to go over the hill to my aunt's house, but I went southbound. I went into a house, but I have

no idea why I went in there. It was just what happened. I did not have a weapon with me. I did not pick the house it was where my body went. My body kicked the door in. I had no reason to be there. Nobody I know lives there[.] After I knocked the door in[,] my hand grabbed a butcher knife with the left hand, but I am right-handed. I could not speak. There was a guy named Foster. I did not know his name until I read about it later. He told me to get out and my brain could not move my body. All I remember after that was stabbing him.

Martin insisted, "I did not have control over my bodily movements. I felt like I was out of my body. I do not remember how many times I stabbed him. I can't remember where I stabbed him. One hit him in the chest." He added,

When I grabbed the knife, I felt for my safety and his and was hoping the police would show up. Because of how I was feeling at the time, and I had no control over what was going to happen. I know what I did was wrong, and at the time, my body was doing it, and I had no control on how to stop it.

Rosell noted that Martin was not on medication at the time of the crimes and, in his opinion, Martin's statements to police "made no sense." Rosell believed that Martin's speech during the police interview showed common symptoms of a psychotic disorder: auditory hallucinations and delusions, and disorganized and nonsensical or tangential speaking. In contrast, during his interview with Martin several years later when Martin was being treated, Rosell found that he "was back to being a normal person, could answer questions, could follow direction, and . . . was able to have a conversation."

Rosell administered several tests designed to measure psychiatric illness and malingering. On the Miller Functional Assessment of Symptoms Test (M-FAST), Martin's score suggested he was not feigning mental illness. Similarly, the results of the Structured Inventory of Reported Symptoms-2 Test (SIRS-2) showed he was not trying to exaggerate his psychopathology. And the Rogers Criminal

Responsibility Assessment Scales (R-CRAS) revealed that Martin had lost his "behavioral and cognitive control" at the time of the crimes. According to Rosell, these results confirmed that Martin did not have "the capacity to know or appreciate that his conduct was wrong." But Rosell's report also acknowledged, "There is no known psychological instrument that can measure a person's state of mind at a specific time in their past," and the R-CRAS "should not be viewed as a stand-alone source" but was only "a piece of the evaluation process."

Beyond the testing, Rosell viewed the interrogation as evidence of Martin's incoherent "mindset after the offense occurred." Rosell also considered that Martin had no connection with the victim, no profit motive, and did not flee or hide after the crimes—suggesting that he "may have been experiencing a psychotic episode that induced the criminal behavior."

Rosell downplayed the influence of substance use on Martin's mental state, noting that even when he was not using marijuana or methamphetamine while being held pretrial, Martin continued to have symptoms of schizophrenia severe enough to render him incompetent to stand trial. On cross-examination, Rosell agreed that Martin explained he was aware of his acts as they happened and did not "black out" until after the murder. Martin also reported that this episode of losing control was new for him—he had never experienced such a period, though he had committed violent crimes before. And Rosell agreed that Martin did not explain when this period of "possession" ended.

After the defense rested, Dr. Rosana Jones-Thurman offered rebuttal evidence for the prosecution. She also interviewed Martin and reviewed the past evaluations and records. She administered the Test of Memory and Malingering

(TOMM) and determined Martin was "trying to feign" his symptoms. She also noted jail staff found Martin to be "'normal' in most respects."

Creating confusion about the purpose of her evaluation, Jones-Thurman stated several times in her report that Martin was competent to stand trial. But she added that she did not believe that "he has any diminished responsibility or capacity, and . . . does not believe that he was insane at the time of the crime." She reported he gave consistent information to all examiners, which would not be possible with a psychotic impairment. She also believed that Martin "deliberately went to that house and remembered it for numerous years and potentially wanted to seek revenge on someone, [which] indicates planning and intact executive functioning." She noted his "past crimes indicate a level of violence and impulsiveness but that is not the equivalent of 'deranged' or psychotic." Finally, she noted he "could have had some psychotic symptoms at times due to his substance abuse" but declared him "competent for trial." On cross-examination, Jones-Thurman admitted that the purpose of her report was to determine Martin's competency, not his mental state at the time of the murder.

In her trial testimony, Jones-Thurman recounted reviewing a police interview of Martin's aunt, Roberta. Martin was staying with his aunt at the time of the murder. Roberta reported that Martin had mental-health issues but sometimes exaggerated their severity. Roberta also reported that Martin pretended to see or hear things. And Roberta recounted Martin's long history of violence and behavioral problems.[2]

---

[2] Roberta gave substantially the same testimony at trial.

In reviewing the police interview, Jones-Thurman noticed that Martin tended to go "off-topic" when the officers tried to ask him about the murder. She noticed that Martin was "generally pretty friendly, pretty affable" until the questions focused on Foster; then "he would not make eye contact. He would drop his head down. He would not talk. His affect and demeanor would change." These observations led Jones-Thurman to conclude Martin was not insane on the day of the murder. She believed his animation, his body movement, his eye contact, and other behaviors were inconsistent with psychosis.

Jones-Thurman also found that Martin's conduct on the day of the murder showed he "knew what he was doing." For example, he "targeted" the house, looking for someone specific, entering through the side door rather than the front door. He then grabbed the biggest knife from the block on the counter—knives being his "weapon of choice" in past offenses. Finally, before leaving the house, he tried to clean up the murder scene and himself and then collected the coins and car keys. As her bottom line, Jones-Thurman believed that Martin had "an antisocial personality disorder with psychopathy," but not a psychosis that rendered him criminally insane.

In its ruling, the district court provided a thorough recitation of the expert testimony. But it did not explicitly rely on either expert's opinion in reaching its conclusions. The court treated Martin's statements to Rosell as substantive evidence but did not credit the defense expert's conclusion that Martin was insane. Nor did the court make any finding that Jones-Thurman was credible. True, such a finding could be implicit. Yet the court did not cite any aspect of her opinion in reaching its conclusions on diminished capacity or insanity. Indeed, after the

court's verdicts, the defense asked for more explicit credibility findings. But the court denied that request without analysis. It is possible the court found neither expert credible nor helpful in determining Martin's sanity at the time of the offenses. But the absence of a finding to that effect, explicit credibility determinations, or any weighing of the experts' testimony hinders our review. *See Connell v. Barker*, No. 22-1791, 2023 WL 4759458, at *4 (Iowa Ct. App. July 26, 2023) (Buller, J. specially concurring) (explaining "the difficult position the appellate courts are put in when the district court does not make express credibility findings or explain why it is rejecting what appears to be credible testimony in favor of other evidence").

Having aired our grievance, we turn to the substance of the court's ruling. First, the court acknowledged that Martin suffered from a mental condition that affected his behavior and thinking. It found that the "crux of the defendant's insanity defense as it pertains to the murder charge is his reported lack of control of his behavior during the crime." The court noted that this "irresistible impulse defense" has been subsumed under the *M'Naghten* test[3] and codified in section 701.4. But the court rejected Martin's argument that mental illness rendered him incapable of knowing the nature and quality of his acts:

> To know and understand the nature and quality of one's acts means a person is mentally aware of the particular acts being done and the ordinary and probable consequences of them. The defendant's own words to Dr. Rosell show that he was aware of murdering Foster. The defendant stated that he remembered grabbing the butcher knife and remembered stabbing Foster. He said he did not remember how many times he stabbed Foster or when but did know that at least one stab was to Foster's chest. While the defendant may assert that he was not in control of his body at the time, his own admissions clearly demonstrate knowledge of the nature and quality of his actions. Further, there is no evidence that his claimed psychosis regarding

---

[3] *M'Naghten's Case*, 10 Clark & F. 200, 210, 8 Eng.Rep. 718, 722 (1843).

control of his body affected his understanding or comprehension of the act, just the ability to restrain his actions.

The court also rejected Martin's argument on the second alternative, finding the evidence showed he could distinguish between right and wrong in his acts.

As to the burglary and robbery charges, the court acknowledged that Martin's behavior was "largely nonproductive," but reasoned that "the level of success a defendant has in engaging in criminal behavior does not alone prove insanity." Rather, the court found:

> The steps taken by the defendant to evade detection, while ineffective, were not so abnormal to show that the defendant did not have the capacity to know the nature and quality of his actions or that he was incapable of distinguishing right and wrong. The same holds true for the fact that the defendant did not take any other valuables from the Foster residence despite them being in view and easily transported. Defendant could have stolen more items of greater monetary value; however, his failure to do so does not prove a lack of capacity to know the nature and quality of his actions or the ability to distinguish right and wrong.

Rather than rely on the psychologists, the court used the circumstantial evidence surrounding the offenses to determine Martin was sane—though he had a mental-health impairment. The record supports the conclusion Martin was suffering from a mental-health condition. Before the murder, Martin had been diagnosed with schizophrenia and involuntarily committed twice. His behavior and speech on the day also reflected a diseased or deranged mind. But suffering from a psychiatric disorder alone does not mean a defendant must be found criminally insane. *See State v. Venzke*, 576 N.W.2d 382, 385 (Iowa Ct. App. 1997) (affirming trial court's conclusion that a schizophrenic defendant's "delusions and hallucinations were not sufficiently severe as to render him insane" under our statute).

On appeal, Martin contests the district court's characterization of several aspects of his behavior, insisting that his conduct did not show he understood the nature and quality of his acts or could distinguish that they were wrong. For instance, he argues that leaving clothes in the washer and placing towels around Foster to mop up his blood were not attempts to conceal evidence. He also notes that he could have stolen more valuable items from the house. He claims he did not hide the knife but threw it haphazardly into the sink. Finally, he points out that he did not flee but circled back toward the house. All in all, Martin faults the district court for giving "scant analysis" of the evidence showing his deranged mental state—evidence he believes "reveals a person in a severe state of psychosis."

Martin has a point; much of the circumstantial evidence can reasonably be interpreted as variably supporting or refuting the view that he was criminally insane. In such a case, experts help interpret such evidence. *See* Iowa R. Evid. 5.702 (an expert may testify if their "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"). But as noted, the district court did not provide an express weighing of the experts' credibility. And while it is tempting to second-guess the court's reading of the facts given the comparably reasonable interpretation Martin suggests, sufficiency-of-the-evidence review requires us to take the evidence "in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence." *State v. Ortiz*, 905 N.W.2d 174, 180 (Iowa 2017) (citation omitted). "Evidence is not rendered insubstantial merely because it might support a different conclusion; the only question is whether the evidence

supports the finding actually made." *State v. Emanuel*, 967 N.W.2d 63, 68 (Iowa Ct. App. 2021).

The district court viewed much of the circumstantial evidence as showing Martin's consciousness of guilt, allowing an inference that he understood the nature and quality of his acts and distinguished that they were wrong. *See, e.g.*, *State v. Mong*, 988 N.W.2d 305, 314 (Iowa 2023) (finding acts showing consciousness of guilt can be substantial evidence of the defendant's specific intent to harm). The court's view was supported by substantial evidence. It was reasonable to conclude that Martin tried to clean up the scene by mopping up blood and putting the knife in the sink. Martin displayed even stronger evidence of his sanity by trying to wash his bloody clothes before leaving the murder scene. And when Martin was unsuccessful in doing the laundry, he chose to don Foster's ill-fitting jeans rather than walk out with his own bloodstained clothing. Overall, Martin's conduct after the stabbing raises the reasonable inference that he was trying to conceal his involvement, which supports an inference that he was aware of the nature and wrongfulness of his acts. Martin later lied when police asked him where his shirt was, further supporting that inference.

Other conduct also bolstered the court's finding of sanity. Martin approached the house that morning and then returned, entering through the side door rather than the front, suggesting his ability to plan a stealthy entry. Martin reported "kick[ing] the door in," supporting an inference that he was aware he was not welcome. After entering, he armed himself with a knife from the kitchen counter, showing an intent to attack. And Martin left the house with Foster's coins and his car keys, showing a motive for the attack of personal gain, even if those

gains were small and more valuable items were available.  Martin even spent the stolen change at the convenience store a short time later.  Those acts support an inference that Martin had rational motives.

Finally, the court's rejection of the insanity defense was supported by Martin's statements to Rosell that he had no control of his body, though he remained aware of what he was doing.  A loss of bodily control is not the standard for proof of insanity.  Aside from Rosell's opinion, Martin presented no evidence showing he was incapable of knowing the nature and quality of the acts or that he could not distinguish right from wrong.  To the contrary, he explained to Rosell that when he "grabbed the knife," he knew that there was reason to fear for Foster's "safety" and he "hop[ed] the police would show up."  Those admissions showed Martin knew the nature of his acts—that he presented a danger to Foster.  His mention of law enforcement signaled that he could distinguish that his acts were wrong.  *See State v. Wheeler*, 403 N.W.2d 58, 61 (Iowa 1987) ("If the trier of fact finds the defendant was able to comprehend the nature and consequences of the act and knew the act was wrong, the defense of insanity falls even though the defendant may have acted from irresistible impulse.").  Combining Martin's admissions and his conduct surrounding the murder—and taking all reasonable inferences that can be drawn from that evidence—we find substantial evidence supports the district court's conclusion that Martin failed to prove his insanity defense.  We thus affirm the court's verdicts.

**AFFIRMED.**